**In re DOCTORS HOSPITAL, INC., Bankrupt.**

**Bankruptcy No. 79–00185.**

United States Bankruptcy Court, District of Columbia.

May 12, 1980.

David Machanic, pro se of Pierson, Ball & Dowd, Washington, D. C., as Trustee in Bankruptcy.

Jo V. Morgan, Charles J. Steele, and Richard M. Tarby, Whiteford, Hart, Carmody & Wilson, Washington, D. C., for respondent Group Hospitalization, Inc.

## MEMORANDUM OPINION

(Trustee's Application for Authority to File Suits)

ROGER M. WHELAN, Bankruptcy Judge.

The sole issue presented to this court by the Trustee's application for authority to file suits, and the opposition filed thereto by Group Hospitalization, Inc. (Blue Cross–Blue Shield) (hereinafter "GHI") is whether the Trustee in Bankruptcy for Doctors Hospital, Inc., David Machanic, Esq., (hereinafter "the Trustee") should be authorized to institute plenary law suits directly against numerous individual patient subscribers insured by GHI in order to recover for hospital services rendered through September 22, 1979 by the now bankrupt Doctors Hospital. Although Doctors Hospital actually filed its petition in bankruptcy on September 18, 1979 [1], the Trustee in Bankruptcy, by prior court order dated September 18, 1979, was expressly authorized to operate the business which in fact he did through September 22, 1979. As a result of the operation of the business, the Trustee claims that there are approximately $295,481.39 in uncollected accounts receivable.[2] These accounts receivable are, moreover, subject to a valid perfected security interest in favor of Riggs National Bank which is presently owed approximately $138,000.00.[3] This secured creditor, as a party in interest, has a real interest in seeing that maximum realization is made on all accounts receivable, and its interest, in this regard, was noted at the time of trial hearing.

The core of the controversy emerges as a conflict between GHI and Doctors Hospital as a result of an alleged set–off which GHI claims against the amounts now claimed by the Trustee for hospital services to GHI patient subscribers. In substance, GHI claims that Doctors Hospital, as a result of its contractual arrangement with GHI, is obligated to:

"... look only to the corporation [GHI] for payment thereof, hospital service to

---

1. This case, therefore, is subject to the substantive provisions of the old Bankruptcy Act. See Bankruptcy Reform Act of 1978, Title IV, § 403(a).

2. In the trustee's latest and second account filed on March 10, 1980, the trustee states: "The hospital holds current receivables owed by GHI patients totalling $299,023.98. At least $265,000 of this amount is covered by GHI under the terms of its contract with the hospital, but no payment is being made by

GHI because GHI continues to insist that, upon completion of the 1978 and 1979 cost reports, the hospital will owe GHI certain sums even if GHI *had* paid the amount it owes on the patient bills."

3. The trustee's second account filed on March 10, 1980, indicates that this indebtedness has been reduced to the aforestated sum and that once the indebtedness is eliminated, all "... all subsequent Receivables collected by the Trustee will become assets of the estate."

the participants of the corporation's plan, . . ."

In addition, GHI claims that as a result of prior overpayments made to Doctors Hospital, which includes an advance deposit of $197,800.00, that Doctors Hospital is in fact indebted to it. The Trustee in Bankruptcy, on the other hand, contends that the primary legal responsibility for the payment of these hospital services (both in–patient and out–patient services rendered by Doctors Hospital) rests with the individual patients, and because of the present dispute with GHI and their consequent refusal to pay for such services, that he should be authorized by this court to proceed with direct law suits against the individual patient subscribers.[4]

After a hearing in open court on these issues, and after due consideration of the documentary evidence presented by both parties, and after assessing the credibility of the witnesses, the court finds the following facts.

## FINDINGS OF FACT

On February 1, 1972, Doctors Hospital and GHI entered into a contractual relationship whereby Doctors Hospital became a participating hospital, and, pursuant to that contract, Doctors Hospital expressly agreed that:

"The Hospital shall furnish, and look only to the Corporation for payment thereof, hospital service to the participants of the Corporation's plan, according to contracts made between the Corporation and its subscribers, and the same hospital service to participants of other Hospital Service Plans with which the Corporation has an Inter–Plan Service Benefit Agreement; . . ."[5]

Relevant to the continuing relationship between GHI and Doctors Hospital is the undisputed fact that the individual patient subscribers are entitled to specific and designated "hospital services" and these are deemed to be service benefits and not mere indemnity provisions. (See GHI's Exhibit 2.)

Part of the present controversy centers about an "advance deposit" which GHI advanced to Doctors Hospital[6] and which, the court finds, is a monetary payment to Doctors Hospital for patient services, and which in turn was deposited to Doctors Hospital's general checking account. In this regard,

---

**4.** The trustee's pending proposal to file law suits directly against GHI patient subcribers is of concern, not only to the insurer, GHI, but also to the Office of Personnel Management, United States of America. In a letter to Blue Cross–Blue Shield Vice President James Gillman, dated February 26, 1980, Willie H. C. Brown, Assistant Director for Insurance Programs, commented as follows:

"We are writing to you to express the concern of the Office of Personnel Management over the Doctors Hospital situation. We understand that the Trustee of Doctors Hospital, a bankrupt, has applied to the bankruptcy court for authority to file suits directly against patients of Doctors Hospital. Some of these patients apparently are subscribers to the Government–Wide Service Benefit Plan, ("G–WSBP") offered by the Blue Cross and Blue Shield Associations to Federal employees and annuitants. . . .

"We are not familiar with the merits of the dispute between the trustee and the local Blue Cross plan, Group Hospitalization, Inc., and we express no opinion with regard to that dispute. However, we believe that the trustee's proposal to sue subscribers directly is contrary to the objectives of the statute pursuant to which the G–WSBP has been established. The proposal also would, if carried out, have serious, detrimental effects on the innocent subscribers involved."

**5.** This contract was also entered into with the Metropolitan Hospital for Extended Care, a wholly owned extension of Doctors Hospital, Inc., and the provisions dealing with the former institution are set forth under *Part B* of this same contract. See GHI Exhibit 1.

**6.** The advanced deposit totalling $197,800.00 is composed essentially of two components: a deposit balance of $192,300.00 calculated as of August 31, 1979, and a further balance of $5,500.00 calculated in September 1979, the final month of operations for Doctors Hospital. The actual deposit, as noted in the testimony of Benjamin W. Giuliani, varies from year to year depending on various cost factors, and was originally advanced at the time that this master contract was entered into.

specific references made to Paragraph XIV [7] which provides that:

"Payments by the Corporation to the Hospital, in *additional* [sic] *to an advance deposit*, shall be made promptly at least weekly. Such advance deposit shall recognize, to the extent deemed reasonable and proper and according to the Corporation's records, *the length of stay of the Corporation's participants*; *the Hospital's claim processing time*; *the corporation's claim processing time*; and the transit time from and to the hospital." [emphasis added]

The aforementioned contractual provisions specifically links the advance deposit to "the length of stay of the Corporation's participants" and coupled with the testimony of Benjamin Giuliani, GHI's vice president, the court finds that this deposit was, in fact, adjusted annually to reflect the various factors relating to patient expense experience.

Furthermore, the testimony of Benjamin Giuliani establishes that this deposit was intended to supply Doctors Hospital with needed operating funds in order to defray daily hospital care rendered to GHI patients. In fact, this witness explained in detail the average hospital stay, the processing time necessary to clear the billed hospital charges, and the time necessary to transmit eventual payment to Doctors Hospital.[8] The court finds, therefore, that a logical nexus exists between the advance deposit and the hospital services rendered to GHI patients. This is further buttressed by the fact that Paragraph XIV, following the payment provisions of the prior two

---

7. This paragraph was noted erroneously as Paragraph XXXII in Group Hospitalization's memorandum–however, Paragraph XXXII *is* contained in Part B of the master contract, which deals solely with the obligations and duties of the Metropolitan Hospital for Extended Care, an entity not involved in this litigation.

8. Further reference was made to Paragraphs XII and XIII of the contract which further provides as follows:

XII. The Corporation shall, for hospital service furnished participants admitted for inpatient care or participants provided outpatient care after February 1, 1972, compensate the Hospital as follows:

A. Tentatively, at an agreed upon percent of the Hospital's usual charges for inpatient hospital service rendered participants during service benefit days.

B. Tentatively, at 100% of the allowance applicable to inpatient cases or inpatient days for which the Corporation authorizes a dollar allowance.

C. At 100% of the Hospital's usual charges for outpatient hospital service rendered eligible participants.

The tentative payments provided for in A above shall be reviewed at least quarterly and shall be estimated to approximate the amount necessary to satisfy the Corporation's ultimate liability to the Hospital as determined by the provisions of Paragraph XIII.

XIII. Following the close of the Hospital's fiscal year, beginning with the year ending _____ the ultimate patient day payment by the Corporation and its participants to the Hospital for hospital service rendered participants admitted as inpatients during the Hospital's fiscal year, to the extent authorized by the Corporation, according to contracts made between the Corporation and its subscribers, shall for hospital service rendered during service benefit days or applicable to inpatient cases or inpatient days for which the Corporation authorizes a dollar allowance, be the lower of:

A. The Charge Factor–100% of the Hospital's usual charges for hospital service rendered participants, or

B. The Cost Factor–104% of the Hospital's cost of hospital service calculated in accordance with the Cost Formula set forth in the Cost Manual referred to in Paragraph X hereof.

When the determination of the total ultimate payment has been made and such determination discloses an amount due from one party to the other, such amount shall be paid within thirty (30) days after written notice of the amount due has been given or arrangements shall be made at that time for payment. If not so paid or if mutually acceptable arrangements for payment are not so made within said thirty (30) days, such amount may be offset against any monies due or to become due from either of the parties hereto to the other.

These particular contractual provisions relate to the exact computation of payment due from Group Hospitalization to the participating hospital for hospital services based on the hospital's "usual charges" or pursuant to a cost factor of "104%." The court is of the opinion that Mr. Mangin's testimony, adduced on behalf of the trustee, did not, in any material way, refute any of the salient financial points developed by Mr. Giuliani relating to the computation and application of such payments, or to the advance deposit and its handling.

paragraphs (Paragraphs XII and XIII), expressly refers to:

"... in addition[al] [sic] to an advance deposit ..."

According to the testimony of Benjamin Giuliani, and the accounting figures introduced in evidence (GHI Exhibit 4), there were *covered* charges of $265,943.13 due to Doctors Hospital as of the close of business in September, 1979.[9] These covered charges were submitted to GHI by Doctors Hospital and were calculated but not paid because of alleged monies due and owing to GHI for prior overpayments made to Doctors Hospital by GHI. These alleged overpayments relate to prior annual audit adjustments which, according to GHI, amount to a net figure of $126,431.00. This is the figure ultimately claimed to be due and owing to GHI as reflected in the affidavit of Benjamin Giuliani[10]. There is, at this juncture of the proceeding, but without prejudice to the rights of the trustee to establish monies due and owing from GHI for patients' services rendered, a reasonable basis for accepting the *tentative* calculations set forth in the affidavit and Exhibit 4 which reflect that monies are due and owing to GHI. It must be pointed out that the trustee accepts all figures in the affidavit with the exception of the "estimates"– estimates to be finally determined upon completion of the aforesaid audit procedures in progress now by GHI.

## CONCLUSIONS OF LAW

■ In administering a bankruptcy estate, the Trustee in Bankruptcy has a fiduciary obligation to collect all monies due and owing to the estate. Bankruptcy Act § 47a(1); 11 U.S.C. § 75a(1). Pursuant to Bankruptcy Rule 610, the Trustee may, with or without court approval, "... commence and prosecute any action or proceeding in behalf of the estate, before any tribunal". Because of the unique legal issues raised in this proceeding *vis–a–vis* GHI, the Trustee has prudently sought prior court approval prior to collecting what he perceives as accounts receivable of this bankruptcy estate. There can be no question that the issue as to the Trustee's authority and his legal right to file such lawsuits is an issue squarely and properly before this court for decision. In fact, both parties have expressly consented to the summary jurisdiction of the Bankruptcy Court and the nature of the present controversy warrants a prompt determination by this court. *Knapp v. Seligson (In re Ira Haupt and Company)*, 398 F.2d 607 (2d Cir. 1968).

■ The apparent basis for the Trustee's proposed cause of action in filing law suits directly against GHI patient subscribers emanates from "unpaid" patient accounts– accounts generated as a result of hospital services rendered by Doctors Hospital to the aforesaid individuals. The Trustee in Bankruptcy, having been denied payment by GHI, as the insurer of such patients, for reasons set forth in the Findings of Fact above, seeks to collect these amounts now from the patients themselves[11] based on a contractual provision set forth in Doctors Hospital application form which provides that:

"I understand I am financially responsible for all charges ..."

Hospitalization in the pending bankruptcy of Doctors Hospital (See Proof of Claim filed October 25, 1979, in the amount of $222,349.00 plus.) At any rate the Trustee has been unable to adduce any final figures which would warrant the court in drawing any inferences other than those already stated in this opinion.

---

**9.** The difference between GHI's figures of $265,943.13 and the Trustee's figures of approximately $295,000.00 would apparently result from the fact that the Trustee's figures reflect aggregate billing for all services rendered, which billed services may include hospital services *not* covered by GHI insurance– namely, non–covered services in the subscription insurance contract.

**10.** Because of an on–going and presently uncompleted audit for the years 1978 through 1979 (through the close of business in September 1979) conducted by GHI, the final amounts due and owing are subject to separate litigation resulting from a proof of claim filed by Group

**11.** To the extent, as previously pointed out in the Findings of Fact, *supra*, that there are ascertainable *uncovered* services or charges, the Trustee is clearly free and is hereby expressly authorized to collect such sums in any legal manner he deems advisable.

"The undersigned agrees, whether he signs as agent or as a patient, that in consideration of the services to be rendered to the patient, he hereby individually obligates himself to promptly pay the account of the hospital in accord with the regular rates and terms of the hospital. ... Provisional credit may be allowed for confirmed insurance benefits when assigned to the hospital. All such provisional credits are subject to collection thereof by the hospital. ..."

(Trustee's Exhibit 2)

These provisions, however, must be considered in relationship to the patient's subscription contract (GHI Exhibit 3) and the master contract entered into between Doctors Hospital and Group Hospitalization (GHI Exhibit No. 1). The Doctors Hospital application form is certainly not inconsistent with the latter contracts and should therefore be considered in pari materia. As aptly stated in 17 Am.Jur.2d *Contracts* § 264 at 670 (1964):

"Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated."

The contractual provisions in the master contract previously entered into between Doctors Hospital and GHI are clear and unequivocal in that Doctors Hospital has expressly obligated itself to look to GHI for all covered hospital services—in this framework, the individual patient subscriber has a right as the result of his contractual relationship with GHI to expect that the latter insurer will, in turn, pay directly to Doctors Hospital all covered services. The dispute, as to the monies due and owing, either to or by Doctors Hospital, is of no immediate or legal concern to the patient in this context.

Furthermore, it is the court's opinion that the "advance deposit" is inextricably involved with the contract payments made to Doctors Hospital for "hospital service[s] rendered participants" and that the Trustee in Bankruptcy is, in turn, bound by the terms and provisions of that master contract. Even were the court to assume that the advance deposit was not connected with or linked to the amounts due for billed patient services, GHI would, nonetheless, have a legal right to set off any monies due by reason of their prior overpayments as against any monies due Doctors Hospital for covered services in the amount of $265,943.13. While mutuality of obligation is the heart of the set–off doctrine in bankruptcy, it is not necessary that the debts and credits be of the same kind or character. The traditional doctrine of set–off is mutuality, not similarity as to obligation. 4 *Collier on Bankruptcy*, § 68.04[2] at 862, (14th Ed. 1978)

Should the Trustee in Bankruptcy in the context of this proceeding be authorized to file law suits against individual patient subscribers, it might well be anticipated that third–party actions would inevitably be filed against GHI–such result being predicated on the fact that the individual patient subscribers are the third–party beneficiaries of the master contract entered into between Doctors Hospital and GHI. (See GHI Exhibit 1, Part A–Paragraph 1, cited *supra.*) It is well established law that a third party may, in his own name, enforce a contractual provision made for his benefit. 17 Am.Jur.2d *Contracts* § 296 at 713–714; § 302 at 722 (1964). In this proceeding, the patient is clearly the immediate beneficiary of the master contract entered into between Doctors Hospital and GHI; the individual patient pays premiums for covered hospital services and is entitled to benefits to the extent covered by this policy.[12]

As might be logically anticipated in any litigation against such a patient subscriber,

12. In this regard the remarks of Willie H. C. Brown, Assistant Director for Insurance Programs, is relevant:

"Subscribers to the G–WSBP have paid their subscription charges in good faith, expecting that they would not have to be concerned

the issue of monies due from and/or to GHI would be directly in issue and would, moreover, properly be a matter for resolution ultimately by the Bankruptcy Court.

Finally, to permit the Trustee in Bankruptcy to file such individual law suits against patient subscribers (assuming a legal basis for such action) would neither be advisable nor in the best interest of the bankruptcy estate for these further compelling reasons:

1. Each of the individual patient subscribers (to the extent of *covered* services) will be subject to the expense and embarrassment of litigation which directly relates to his hospitalization insurance contract—with potentially grave adverse consequences to the individual.

2. There will be the usual anticipated expenses of administration involved in instituting numerous law suits in this jurisdiction (assuming that the District of Columbia is the proper forum for all such litigation as asserted by the Trustee) with somewhat questionable consequences where third party actions are involved.

3. Even in the event that default judgments could be secured in some cases, there would exist serious collection problems in satisfying such judgments, and, in the event and to the extent that such judgments were satisfied, there could be involved a serious issue as to unjust enrichment on the part of the estate to the extent that GHI possessed a valid claim of set–off.

4. There is an available forum (namely, the Bankruptcy Court) to determine the actual sums that may properly be due to the Trustee in Bankruptcy for such hospital services. There can be no doubt that the Bankruptcy Court will properly exercise summary jurisdiction over any counterclaim for monies properly due the bankruptcy estate. *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

5. The ultimate party responsible for the payment of these hospital charges is clearly GHI and in the event that they are

about any bills for covered hospital services. Permitting direct suits by the trustee against subscribers would contradict the statutory

determined to be monies due to the estate from such entity, it would certainly be more expeditious for the Trustee to look directly to GHI rather than to individual patient subscribers, whose ability to pay any judgment might be of serious question.

CONCLUSION

For the above stated reasons, the Bankruptcy Court denies the Trustee's application to file suits, except where there is a reasonable factual basis for determining that the amounts due from an individual patient subscriber are for *noncovered* services, or in those cases where there is evidence that no hospital coverage was in effect at the time that the hospital services were rendered.

The court's ruling, as already noted, is without prejudice to the rights of the Trustee in Bankruptcy to set forth his claims in the nature of a valid counterclaim or set–off against any sums that are ultimately found to be due and owing to Group Hospitalization, Inc. Counsel for Group Hospitalization, Inc., should submit an appropriate order to this court within 3 days and serve simultaneously a copy on the Trustee in Bankruptcy for this estate.

objections." [of 5 U.S.C. 8901 *et seq.,* The Federal Health Benefits Act of 1959]