**WORSTER MOTOR LINES, INC., Plaintiff,**

**v.**

**.Otto LOMBARDO, d/b/a AFI Leasing, Inc., Defendant.**

**Civ. A. No. 80–110 Erie.**

United States District Court,
W. D. Pennsylvania.

Jan. 28, 1982.

Robert Ward, Erie, Pa., for plaintiff.

Robert Kelleher, Erie, Pa., for defendant.

## OPINION

WEBER, Chief Judge.

The purpose of language is to provide man with a medium for the communication of ideas. Unfortunately, however, in practice our language frequently lacks precision and clarity. Because the meaning of the words we use is often-times elusive, language in many instances serves to confuse rather than clarify. The instant case presents an excellent example of this principle. In this case the parties, two knowledgeable and intelligent businessmen, conducted extensive contract negotiations over a period of three months. As a result of these negotiations written proposals were submitted; documents were signed; and some $15,000 changed hands. Yet it is apparent that, throughout these negotiations, the meaning these parties attached to their words differed significantly. In short, it is clear that these parties never really agreed to anything at all.

At the non-jury trial of this case the testimony of two witnesses was presented. These witnesses—Mr. Vincent Worster and Mr. Otto Lombardo—are the principals in this lawsuit. They are also the individuals who negotiated the transactions that led to this lawsuit.

Not surprisingly the testimony of these individuals conflicts in several important respects. We believe that both of these witnesses are honest and credible individuals. The discrepancies in their testimony we attribute to mutual misunderstandings, not to any deliberate attempt to conceal or falsify. Because we ascribe these conflicts in testimony to mutual misunderstandings by the parties we will not try to reconcile the differing versions of events presented by Worster and Lombardo. Rather will simply note those differences when appropriate.

Generally the testimony received at trial revealed the following facts: In the fall of 1979 the plaintiff became interested in purchasing an aircraft. In order to obtain the long-term financing necessary for such a purchase the plaintiff contacted Security Peoples Bank & Trust Company. Security Peoples was unable to provide the plaintiff with the long-term financing he sought. It did, however, arrange to have the defendant Mr. Lombardo contact the plaintiff.

In the meantime the plaintiff arranged interim financing through the First National Bank of Erie, Pennsylvania. Under this interim arrangement the plaintiff received $400,000. This interim financing was scheduled to expire March 31, 1980. Armed with this interim loan commitment Worster purchased the aircraft he sought.

In the latter part of December 1979, the defendant, Mr. Lombardo contacted Worster to see if he could assist Worster in arranging long-term financing for this aircraft. At this time Mr. Lombardo was working as a leasing consultant with Security Peoples.

There is some dispute as to precisely what occurred at this first contact between Worster and Lombardo. In his testimony Mr. Worster indicated that he informed Lombardo that he was seeking financing through other lenders, including Westinghouse Credit Corporation. In fact, at this time Worster had received a firm commitment from Westinghouse to provide long-term financing for this deal. Worster stated that he was unaware of any agreement or custom preventing him from obtaining firm commitments from several lenders. In addition, at trial, Worster denied making any agreement to deal exclusively with Lombardo in arranging financing for this deal.

In his testimony Lombardo acknowledged that he was aware that Worster had been quoted interest rates by other lenders. Lombardo denied, however, that he had been expressly informed that Worster had already received a firm commitment from another lender. According to Lombardo had he known this he would not have pursued further dealings with Worster. In fact, it was Lombardo's understanding that Worster was going to deal exclusively through him in arranging this long-term financing. According to Lombardo such exclusive arrangements were common in this business.

Despite these fundamental misunderstandings the parties went forward with arrangements for long-term financing. On January 10, 1980, the defendant submitted to the plaintiff a document styled "Lease Proposal". Under this proposed agreement the long-term financing of this aircraft purchase would be structured as a lease. Lombardo, through AFI Leasing, Inc., would act as the lessor of the aircraft. Worster would, in turn, act as lessee. The agreement provided for 60 monthly rental payments of $15,208.74, plus a commitment fee of one month's rent. Under the terms of this agreement the "Lease Proposal" was subject to approval by AFI's credit committee. The projected date for the funding of this agreement was February 15, 1980.

Worster reviewed this proposal; signed it; and forwarded the proposal along with a check for the commitment fee to Lombardo.

Again, however, the testimony of the parties reflects serious misunderstandings regarding the essentials of the agreement entered into. According to his testimony Worster was concerned regarding the expiration of his interim financing. He expressed this concern to Lombardo, essentially informing him that time was of the essence in this agreement. Because of the importance of closing this deal in a timely manner, Worster understood the February 15 projected delivery date to be a firm deadline. Worster also understood that his commitment fee was refundable if this agreement was not consummated or if he obtained funding from some other lender.

In his testimony Lombardo admits that he was aware of Worster's interim financing. He denies, however, that the parties ever agreed that time was of the essence in this deal. Because Lombardo did not view the timing of this deal to be critical, he regarded the February 15 delivery date as nothing more than a projection. In addition, consistent with his understanding that he was Worster's exclusive agent, Lombardo regarded the commitment fee as good

faith money. He did not, therefore, feel that that fee was automatically refundable to Worster.

Subsequently the parties agreed that this lease arrangement was not satisfactory. Accordingly the parties agreed to restructure the agreement as a loan rather than as a lease.[1]

Lombardo then set about to obtain a loan commitment for Worster from some third party lender. As a result of Lombardo's efforts, a loan proposal was submitted to Worster by Wells-Fargo Leasing Company on January 30, 1980. The terms of this proposal were more favorable to Worster than those he had independently received from Westinghouse Credit Corporation. The Wells-Fargo proposal was subject, however, to approval by Wells-Fargo's Investment Committee. The proposal was scheduled to expire on February 15, 1980. Worster signed this proposal on February 1, 1980 and returned it to Wells-Fargo.

The Wells-Fargo proposal was never accepted by the Investment Committee, however. Ultimately Worster turned to Westinghouse Credit Corporation for long-term financing of this deal. Worster then requested the refund of his commitment fee from Lombardo. Lombardo refused to return this fee, arguing that he had encountered significant expenses and hardship on Worster's account. This lawsuit followed.

Once again we find that the dealings of the parties were freighted with serious misunderstandings. At this time the parties apparently disagreed regarding both the adequacy of the Wells-Fargo proposal and the sufficiency of the financial data submitted by Worster to Lombardo.

Lombardo testified that the Wells-Fargo proposal was completely adequate and that he expected that proposal to be approved. According to Lombardo the delay in the proposal's approval was the result of Worster's failure to provide a consolidated financial statement to the lender.

---

estingly, at trial, each party indicated the other party who initially suggested the restructuring of this deal.

Worster however denied this, stating at trial that the proposal received from Wells-Fargo was inadequate. In his testimony Worster stated that he believed that the Wells-Fargo proposal expired on February 15, 1980. Since he had not received approval from the Investment Committee by that date he concluded that the proposal was worthless to him. Furthermore, Worster denied that the financial data provided by him to Lombardo was inadequate. In fact, according to Worster, he was able to use this same data to independently obtain long-term financing.

■ In their pleadings both parties have alleged that a binding contract existed between them. Each has then contended that the other violated some of the terms of that contract. As a result of these alleged contractual breaches the plaintiff demands the return of its commitment fee. The defendant, on the other hand, contends that the plaintiff's failure to perform entitles him to retain that fee.

We feel that each party errs in its characterization of this case. It is a fundamental principle of contract law that, in interpreting an agreement, the mutual intention of the parties is controlling. *Walther & Cie v. United States Fidelity & Guaranty Co.*, 397 F.Supp. 937 (M.D.Pa.1975). Accordingly in order for an agreement to exist there must be a meeting of the minds. This mutual assent is the very essence of the contractual relationship. Therefore, without such mutual assent no enforceable agreement exists. *Irma Hosiery Co. v. Holm Indemnity Co.*, 276 F.2d 212, 214 (3d Cir. 1960) (applying Pennsylvania law); *Walter & Cie v. United States Fidelity & Guaranty Co.*, supra; *Hahnemann Medical College & Hospital etc. v. Hubbard*, 267 Pa.Super. 436, 406 A.2d 1120, 1122 (1979). "Furthermore, in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain. (citations omitted)". *Lombardo v. Gasperini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956).

In this case it is clear that the parties never agreed to the "material and necessary details of the bargain." At trial it became apparent that Worster and Lombardo honestly and unwittingly disagreed regarding virtually all of the details of their "agreement". For example, Worster, felt that he was free to seek credit elsewhere; Lombardo thought that Worster was dealing with him exclusively. Similarly Worster believed that time was of the essence in this deal; Lombardo felt no such time constraints. Worster also understood his commitment fee to be automatically refundable; Lombardo on the other hand had no such understanding regarding this good faith money. In addition Worster and Lombardo labored under mutual misunderstandings regarding the significance of the February 15 deadline; the sufficiency of the financial data supplied by Worster; and the adequacy of the Wells-Fargo proposal. Ultimately these misunderstandings compounded, one upon the other, until the entire business deal between these parties collapsed.

Given this total failure by the parties to arrive at any understanding regarding the essentials of their business deal we conclude that no binding, legally enforceable contract exists between them. Accordingly, the defendant has no right to retain the commitment fee paid to him by the plaintiff. Therefore, that fee must be returned.

■ One final matter remains for our consideration. In his pretrial narrative and at trial, Mr. Lombardo presented a list of expenses he had encountered in connection with his dealings with Worster. Lombardo requested that he be allowed his expenses as his damages in this action.

Both parties agree that Worster never promised to compensate Lombardo for his expenses. Therefore, Lombardo is apparently seeking recovery of these expenses on some quasi-contractual theory of liability.

We will not allow Lombardo to recover these damages in this lawsuit. In this case

the defendant's claim for these damages was not made in its answer to plaintiff's complaint. Instead that claim was first articulated in the defendant's pretrial narrative. This narrative was filed almost one year after the initiation of this lawsuit. By this time discovery in this case had been closed and the matter was ready to proceed to trial.

Under the Federal Rules of Civil Procedure a set-off of the type requested by this defendant is an affirmative defense which the party should set forth in his Answer. Fed.R.Civ.P. 8(c); see also *United States v. American Packing & Provision Co.*, 122 F.2d 445, 449 (10th Cir. 1941), (set-off is an affirmative defense pleaded under Rule 8). Similarly Pennsylvania law requires that "damages in quantum meruit for the reasonable value of services must be specially pleaded. (citations omitted)." *Pulli v. Warren National Bank*, 488 Pa. 194, 412 A.2d 464, 465 (1979).

In this case it is undisputed that the defendant did not timely plead this quasi-contractual, set-off defense. Because this defense was not timely pleaded, and because several elements of the defendant's bill of expenses appear to be unsupported, we will not allow any recovery on this claim.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the findings of fact and conclusions of law made by the court are embodied in this opinion.

An appropriate order will issue.