No. 94-556

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

FEDERAL DEPOSIT INSURANCE CORPORATION, as
RECEIVER OF FIRST SECURITY BANK OF ANACONDA,

Plaintiff and Respondent,

v.

NORTHERN MONTANA GAS COMPANY,

Defendant and Appellant.

FILED

DEC 28 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Ninth Judicial District,
                In and for the County of Toole,
                The Honorable R. D. McPhillips, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Kenneth E. O'Brien, Hash, O'Brien & Bartlett,
            Kalispell, Montana

        For Respondent:

            Ward E. Taleff, Alexander, Baucus, Taleff
            & Paul, Great Falls, Montana


                    Submitted on Briefs:   December 14, 1995

                            Decided:   December 28, 1995

Filed:

_____
                Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

First Security Bank filed a complaint in the District Court for the Ninth Judicial District in Toole County in which it sought to recover amounts allegedly owed by Northern Montana Gas Company to Montana Pacific Oil & Gas Company (MOPOG) based on well head purchase contracts which Northern allegedly breached. Northern's answer included defenses in which it claimed a right to offset against any recovery obtained by the bank the amount of judgments entered in its favor against First Security's assignor, MOPOG. After a trial, the court concluded that the Federal Deposit Insurance Corporation (FDIC), as the bank's receiver, was entitled to damages and that none of the judgments could be setoff against FDIC. Northern appeals that order. We reverse the court's conclusion that the judgments may not be used to setoff the bank's damage award and affirm the court's award of damages to FDIC.

We restate the issues on appeal as follows:

1.   Did the District Court err when it concluded that Northern could not offset any of its claims against MOPOG against the amounts claimed by First Security Bank pursuant to an assignment from MOPOG?

2.   Was the District Court's award of damages to FDIC supported by substantial evidence?

FACTUAL BACKGROUND

In June 1983, Oil International (OI), entered into several well head purchase contracts (WPCs) to purchase natural gas from

2

Montana Pacific Oil & Gas Company (MOPOG).  In 1984, appellant, Northern Montana Gas Company (Northern), purchased a gas sweetening plant from OI and as part of this agreement, OI assigned to Northern all of its right, title and interest in and to the WPCs. According to the terms of the WPCs, Northern agreed to pay MOPOG $1.50 per thousand cubic feet (mcft) of gas supplied. Adjustments in price were to be made according to a formula provided for in the contract.

As part of the purchase, OI also assigned to Northern all of its right, title, and interest in and to a November 1982 gas purchase contract between OI as seller and Montana Power Company (MPC) as buyer.  This contract had a term of twenty years and provided that MPC would pay the lesser of $3.25 per mcft, as adjusted for inflation, or the maximum lawful price pursuant to the Natural Gas Policy Acts and applicable regulations.  The contract did not require MPC to purchase OI's total production ability.

In July 1985, MPC advised Northern that it had elected to purchase the minimum quantity of gas required by the contract which would in turn reduce the purchases Northern made from its suppliers such as MOPOG.  In October 1985, MPC reduced the price it paid Northern for gas to $3.00 per mcft and began to reduce the amount of gas it purchased from Northern.  As a result, Northern "renegotiated" the terms of the MPC contract and Northern and MPC signed a new contract in October 1985.  The new contract provided

that MPC would pay $3.00 per mcft instead of the $3.25 per mcft agreed upon in the 1982 gas purchase contract.

After Northern and MPC reached their agreement, Northern reduced the price paid to the suppliers, including MOPOG, by $0.25, down to $1.25 per mcft. This adjustment was not in compliance with the WPC with MOPOG which also provided that the seller (MOPOG) had thirty days, after receipt of Northern's statement of gas purchased, to protest the computations underlying those statements. Any statement not protested within that period was deemed correct. While a factual dispute exists as to whether MOPOG protested the decrease, MOPOG did continue to supply Northern with gas. And, in April 1986, Northern made a second reduction in the price paid to suppliers, this time down to $0.40 per mcft.

On April 27, 1988, MOPOG assigned all of its rights and interests in the WPCs to First Security Bank of Anaconda (First Security). The assignment provided First Security with any rights or claims based upon the WPCs, but First Security did not assume MOPOG's liabilities. In 1989, Northern and MOPOG entered a "standstill" agreement pursuant to which MOPOG agreed to delay action against Northern for breach of the WPCs while Northern pursued an action against MPC. Subsequently, Northern received a summary judgment against MPC.

First Security filed a complaint against Northern, based on its assignment from MOPOG, on February 7, 1991. In that complaint, which was filed in Toole County, First Security sought to recover

4

amounts allegedly owed by Northern to MOPOG based on the WPCs which were entered into in 1983. Specifically, First Security claimed that Northern breached its contract with MOPOG when it refused to pay the agreed amount for gas delivered.

In June 1991, Gary McDermott, Northern's president, assigned to Northern a judgment that he had recovered against MOPOG for accounting services that he had performed for that company (McDermott judgment). The McDermott judgment was for the amount of $23,087.49, plus interest from September 1987.

On November 29, 1991, Northern filed a two-count complaint in Flathead County against MOPOG. In the first count, Northern alleged that it had sustained damages based on the defendant's failure to certify wells from which it produced the gas which was the subject of the WPC between MOPOG and Northern. In the second count, it alleged that it had sustained damages because MOPOG failed to make agreed repairs to the natural gas processing plant that Northern had purchased from 01.

On January 28, 1992, the Flathead County District Court entered judgment for Northern in the amount of $200,211.67 based on the allegations in Count I, and in the amount of $131,825.40 based on the allegations in Count II.

On July 15, 1992, Northern filed its answer to the bank's Toole County complaint. As its third defense, it alleged a right to offset against any recovery obtained by the bank the amount of the McDermott judgment. This defense was based on the terms of

5

§ 27-1-502, MCA. For its fourth defense, Northern claimed a right pursuant to the same statute to offset the total judgment entered in its favor in Flathead County on January 28, 1992.

The case was tried by the court without a jury on October 14, 1992. No findings or conclusions were made by the District Court until nearly two years later on October 11, 1994. At that time, the District Court made findings and conclusions based on those submitted by FDIC which had been appointed as the bank's receiver and substituted as plaintiff.

The District Court concluded that pursuant to Rule 13(a), M.R.Civ.P., Count I of Northern's Flathead County claim against MOPOG arose out of the same transaction which was the basis for First Security's complaint (the WPCs) and was a compulsory counterclaim which should have been filed but was not, and therefore, that it was barred.

The District Court then concluded that the McDermott claim against MOPOG which had been assigned to Northern, and Northern's claim which formed the basis for Count II of its Flathead County action, did not arise from the same transaction, and therefore, were not compulsory counterclaims. However, the District Court concluded that because First Security Bank took an assignment from MOPOG of its rights under the WPC without assuming its liabilities, these other obligations (Count II and the McDermott claim) could not be offset against the bank.

6

The District Court also concluded that the McDermott judgment and Count II of the Flathead County judgment could not be setoff against FDIC because to do so would violate the terms of 12 U.S.C. § 1823(e) which invalidates agreements adversely affecting the assets of a bank unless the agreement is in writing. However, on appeal, FDIC, which made that argument to the District Court, concedes that "the FDIC was mistaken in asserting 12 U.S.C. § 1823(e) as a defense to the Northern counterclaims and the district court erred in finding that 12 U.S.C. § 1823(e) was applicable to this case."

Finally, the Court found that MOPOG protested the price reductions imposed by Northern, that the WPCs were still in force, and that both Northern and MOPOG continued to operate under the terms of the WPCs. It concluded that Northern breached the WPCs and awarded damages of $255,861.13 to FDIC.

ISSUE 1

Did the District Court err when it concluded that Northern could not offset any of its claims against MOPOG against the amounts claimed by First Security Bank pursuant to an assignment from MOPOG?

We review a district court's conclusions of law to determine whether the court's interpretation and application of the law is correct. *Jim's Excavating Serv. Inc.* v. *HKM Assoc.* (1994), 265 Mont. 494, 501, *878* P.2d 248, 252.

The District Court concluded that Count 1 was barred because it constituted a compulsory counterclaim which was not raised. It also concluded that even though the McDermott judgment and Northern's claim which formed the basis for Count II of its Flathead County action were not compulsory counterclaims, the claims could not be offset against the bank because First Security took an assignment from MOPOG of its rights under the WPC without assuming its liabilities.

Northern has never claimed that the bank assumed the obligations of MOPOG, or that the bank would be liable to it for the full amount owed to Northern by MOPOG pursuant to the Flathead County judgment and the McDermott judgment. What Northern claims is that pursuant to § 27-1-502, MCA, it has a right to offset against any claim by MOPOG any amounts that it was owed by MOPOG, whether or not those obligations arose out of the same transaction; and that, pursuant to § 27-1-503, MCA, its right to offset could not be defeated when MOPOG assigned its claim to the bank and when that claim was ultimately asserted by FDIC.

Section 27-1-502, MCA, provides as follows:

When cross-demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, the two demands shall be deemed compensated so far as they equal each other and neither can be deprived of the benefit thereof by the assignment or death of the other.

We conclude that when read in the context of § 27-1-502, MCA, "cross-demands" necessarily refers to claims between the parties.

Section 27-1-503, MCA, provides as follows:

8

> In the case of an assignment of a thing in action, the action by the assignee is without prejudice to any setoff or other defense existing at the time of or before notice of the assignment, but this section shall apply only to the extent not otherwise provided for in the Uniform Commercial Code.

MOPOG assigned its rights pursuant to the WPC to First Security on April 27, 1988. At that time, its obligation which formed the basis for Counts I and II of Northern's Flathead County action (failure to certify wells and make agreed upon repairs to the plant Northern purchased from 01) already existed and Northern was entitled to assert that obligation as a basis for setoff. Therefore, pursuant to § 27-1-503, MCA, Northern's right to do so survived the assignment MOPOG made to First Security. However, at the time of the MOPOG assignment, McDermott had not yet assigned his judgment against MOPOG to Northern, and therefore, the bank did not take its assignment from MOPOG subject to setoff by Northern for that judgment.

The District Court concluded that pursuant to Rule 13(a), M.R.Civ.P., Northern's claim in Count I, arose out of the same transaction which was the basis for First Security's complaint (the WPCs) and was a compulsory counterclaim which should have been filed but was not, and therefore, that it was barred. However, Northern did not have a counterclaim against First Security since the bank did not assume the producer's obligations. Therefore, Count I was not a compulsory counterclaim.

The District Court also concluded that the McDermott judgment against MOPOG which had been assigned to Northern, and Northern's

claim which formed the basis for Count II of its *Flathead* County action (failure of MOPOG to make agreed repairs to Northern's gas plant), did not arise from the same transaction, and therefore, were not compulsory counterclaims. However, the District Court concluded that because First Security took an assignment from MOPOG of its rights under the WPC without assuming its liabilities, these other obligations (Count II and the McDermott claim) could not be offset against the bank. The District Court relied on the general rule that in the absence of an express assumption of liability an assignee is not liable for an assignor's obligation.

The District Court's holding fails to recognize the difference between a counterclaim for affirmative relief and a defense which simply seeks to reduce the plaintiff's recovery dollar-for-dollar based on a defense that could have been asserted against the assignor. As noted in *Nancy's Product, Inc. v. Fred* Meyer, *Inc.* (Wash. App. 1991), 811 P.2d 250, 253:

> [W]hen setoff is asserted against an assignee, it diminishes or defeats the assignee's claim, although the assignee has no liability in excess of the amount sued on. Such avoidance of liability is in the nature of a defense, as distinguished from a counterclaim which is a demand for affirmative relief.

Further support for this proposition is found at 6 Am. Jur. 2d *Assignments* § 102 (1963), which provides:

> In an action on a claim assigned, the assignee is ordinarily subject to any setoff or counterclaim available to the obligor against the assignor and to all other defenses and equities which could have been asserted against the chose in the hands of the assignor at the time of the assignment.

10

*See also Pacific N.W. Life Ins. Co. v. Turnbull* (Wash. Ct. App. 1988), 754 P.2d 1262, 1267.

The difference between an affirmative claim for relief and a defense based on setoff is also illustrated by the follow passage from Corbin on Contracts:

> A counterclaim, set-off, or recoupment, arising out of the same transaction as that by which the claim of the assignee was itself created, is usable against the assignee in precisely the same cases that it would be so usable if it were operative as a complete defense. Its operation against the assignee is not affected by the fact that some of the events creating it occurred after the assignment or even after notice of the assignment. The transaction on which the assignee depends is itself a sufficient warning to him that counterclaims may grow out of that transaction requiring an adjustment of remedies. It is therefore thought just to require him to bear the risk that such counterclaims will be used in reduction or total extinction of his own claim. <u>This does not mean that the counterclaim asainst the assisnor is enforceable also as a counterclaim asainst the assignee; it is not so enforceable unless the assignee himself undertook the dutv of performance and has been guiltv of a breach. But the counterclaim. set-off, or recoupment is as effective in reducing the assignee's remedy as it would have been in reducing the assignor's remedv if he were the plaintiff</u>.

4 Arthur L. Corbin, Corbin on Contracts § 896, at 596 (1951) (emphasis added).

While Corbin refers to setoff based on the same transaction, § 27-1-502, MCA, does not limit setoff to claims arising out of the same transaction. It refers only to counterclaims which "could have been set up," in the same action. Pursuant to Rule 13(b) and (c), M.R.Civ.P., any claim that Northern had against MOPOG could have permissibly been set up as a counterclaim if MOPOG had sued Northern for breach of the WPC. Therefore, pursuant to

11

§ 27-1-503, MCA, Northern's right to offset survived the assignment by MOPOG to the bank.

FDIC also fails to recognize the difference between an assignee's liability for an assignor's contract breaches and the right of an obligor to offset the assignor's obligations against the assignee's claim pursuant to § 27-1-502, MCA. It relies on *Bottrell v. American Bank* (1989), 237 Mont. 1, 773 P.2d 694, and *Advance Indust. Fin. Co. v. Western Equities, Inc.* (Cal. Ct. App. 1959), 343 P.2d 408, and asserts that setoff requires mutuality and that mutuality requires that the offsetting debts be due to and from the same persons in the same capacity. However, *Bottrell* is inapposite because it was based solely on the common law right to setoff mutual demands between mutual debtors and creditors. That case had nothing to do with §§ 27-1-502 and -503, MCA, which expressly provide that the right to setoff survives an assignment of one of the party's rights. If we were to agree with FDIC's contention, there could never be setoff when one of the original parties assigned his or her rights. More importantly, that conclusion would render meaningless the language in § 27-1-502, MCA, that "neither [party] can be deprived of the benefit thereof [setoff] by the assignment or death of the other." It would also render meaningless that language in § 27-1-503, MCA, which provides that "[i]n the case of an assignment of a thing in action, the action by the assignee is without prejudice to any setoff or other defense existing at the time of or before notice of the assignment . ."

12

A setoff does require mutuality:

> In order to be mutual the cross demands set up ordinarily must be shown to belong individually to defendant, with a corresponding right to sue for them in his individual name, and defendant, as a general rule, cannot set off a demand on which he is not entitled to sue in his own name . . .

*80 C.J.S. Set-off and Counterclaim § 48* (1953); see also 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff § 74* (1965). In other words, all mutuality requires is that the defendant have a right to assert the claim against the plaintiff or its assignor which forms the basis for setoff.

Montana's law concerning the assignment of contracts has nothing to do with Northern's statutory right to offset its judgment against MOPOG against any recovery by FDIC based on an assignment from MOPOG.

For these reasons, we conclude that Northern was entitled to offset part of its claim pursuant to the plain terms of §§ 27-1-502 and -503, MCA. We affirm the District Court's conclusion that the McDermott judgment against MOPOG, which was assigned to Northern, could not be offset against FDIC's recovery because Northern did not have the right to enforce that judgment against MOPOG at the time that MOPOG assigned its rights to First Security. We reverse the District Court's judgment which held that Northern could not offset the amount due pursuant to Counts I and II of its Flathead County action ($200,211.67 and $131,825.40 plus interest) because pursuant to § 27-1-502, MCA, Northern had a right to offset these amounts against any claim by MOPOG, and pursuant to § 27-1-503,

13

MCA, the right to offset that amount survived the assignment by MOPOG of its rights to First Security.

## ISSUE 2

Was the District Court's award of damages to FDIC supported by substantial evidence?

We review a district court's findings of fact to determine whether they are clearly erroneous. Rule 52(a), M.R.Civ.P.; *Brown v. Tintinger* (1990), 245 Mont. 373, 377, 801 P.2d 607, 609. We review a district court's conclusions of law to determine whether the court's interpretation and application of the law is correct. *Jim's Excavating Serv., Inc. v. HKM Assoc.* (1994), 265 Mont. 494, 501, 878 P.2d 248, 252.

Northern asserts that the District Court should not have awarded damages according to the WPCs because the "renegotiated" contract Northern signed with MPC on October 1, 1985, terminated the WPCs, because MOPOG failed to object to the monthly settlement statements, and because MOPOG acquiesced to the price changes which bars MOPOG from pursuing its claim. We conclude that there is evidence in the record which contradicts each of Northern's contentions.

A review of the record reveals that the 1985 contract did not terminate the WPCs. The WPC provided that it would become effective on the date 01 and MOPOG signed the contract, "and shall continue in effect until the MPC Contract (dated 1982) terminates by its own terms." The MPC contract provided that it would

14

continue for twenty years and "thereafter from year to year until cancelled by one (1) year's written notice."  Also, Northern's president testified at trial that the WPCs were never terminated and the MOPOG president testified that he was not advised that the WPCs were terminated.  Moreover, Northern failed to state that the WPCs were terminated in its letter which advised MOPOG of the 1985 contract.

The evidence also contradicts Northern's assertion that MOPOG failed to properly object to the monthly settlement statements and therefore acquiesced in the price reductions.  Letters and testimony reflect that MOPOG did not acquiesce to the price reductions.  For example, on April 14, 1986, the MOPOG president sent a letter to Northern's president in which he stated that the price reduction did not conform to the WPCs.  Also, on October 8, 1986, the MOPOG counsel wrote Northern and complained about the price reductions and identified the amounts of underpayments. Finally, the language of the WPC contradicts Northern's contention that because MOPOG did not object to the monthly settlement statements it is exonerated.  The WPC only required that MOPOG object to the accuracy of the statements provided by Northern; the objection requirement did not relate to Northern's unilateral reductions in the price paid.

A review of the record reveals substantial evidence to support the District Court's findings that the WPCs were still in force, that MOPOG protested the price reductions, and that both Northern

15

and MOPOG continued to operate under the terms of the WPCs. We also conclude that the court's finding is not clearly erroneous.

We hold that the court did not err when it concluded that Northern breached the WPCs when it failed to calculate the price per mcft in accordance with the WPCs and that FDIC was entitled to damages based on the WPCs.

We remand to the District Court for entry of judgment consistent with this opinion, including any offset to which Northern Montana Gas Co. is entitled pursuant to Part One of this opinion.

_____
us ice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

(Justice James C. Nelson did not participate in this decision.)

16

Justice William E. Hunt, Sr., dissenting.

I dissent. A "set-off" is an equitable defense which in this case was used to reach a potentially inequitable result.

Additional facts not provided by the majority opinion are necessary to fully understand this case.

MOPOG's problems began when MPC drastically lowered the amount it paid for gas. While it previously had paid Northern $3.00 per mcft. for gas, in 1986 it began to pay Northern at the rate of only $1.85 per mcft. Northern passed this drastic price cut on to its suppliers, reducing the amount it paid to MOPOG from $1.25 per mcft. to $0.40 per mcft. MOPOG contested this reduction in writing, but continued to provide Northern with gas. Two years later, MOPOG defaulted on various security agreements, and First Security stepped in.

Northern subsequently sued MPC for breach of contract, and agreed to a "standstill" arrangement with MOPOG pending the outcome of that litigation. Following summary judgment in its favor, Northern received a settlement from MPC in the amount of $1.7 million. Although testimony at trial indicated that the calculations used in reaching the settlement included certain amounts for damages to Northern's suppliers, to date none of the settlement money has been disbursed to MOPOG's successor in interest.

The Flathead County judgment obtained by Northern against MOPOG also needs to be explained in greater detail. MOPOG ceased to exist as a corporate entity in December 1989. In February 1991,

17

FDIC, as MOPOG's successor in interest, sued Northern in Toole County for breach of contract. Northern was duly served with notice of the lawsuit. Nine months later, and nearly two years after MOPOG was dissolved, Northern filed suit against MOPOG in Flathead County for breach of the same contracts which were the basis of FDIC's Toole County suit against it.

Northern admittedly made no attempt to contact any of MOPOG's former officers or directors to inform them of the Flathead County suit. Not surprisingly, MOPOG did not appear. Northern subsequently received a judgment in excess of $332,000 by default, without the merits of its claims ever having been addressed. Northern then filed an answer in the Toole County case, asserting that, pursuant to § 27-1-502, MCA, its Flathead County judgment must be used to offset FDIC's damages.

Section 27-1-502, MCA, was first enacted in 1867, and since that time has never been construed or interpreted by any case in Montana. The statute is not a model of clarity. To remind, § 27-1-502, MCA, reads:

> Survival of counterclaim -- death or assignment. When cross-demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, the two demands shall be deemed compensated so far as they equal each other and neither can be deprived of the benefit thereof by the assignment or death of the other.

This statute provides the circumstances under which a set-off is created. If Party A has an existing demand for a given amount against Party B, and Party B also has an existing demand for a given amount against Party A, the amounts will be deemed to be

18

"set-off" to the extent that they are equal. This interpretation it bolstered by Black's Law Dictionary, which provides that "[w]here a person against whom a demand is made by another, in his turn makes a demand against the other, these mutual demands are called 'cross demands.' A 'set-off' is a familiar example." Black's Law Dictionary 375-76 (6th ed. 1990).

The statute provides for three events in a particular order: the existence of the cross-demands, the existence of the set-off, and then the assignment, which will not affect the existing set-off. The statute does not contemplate a situation, as here, where the set-off follows an assignment of all rights but no liabilities, and the assignor has ceased to exist.

Northern cannot hold FDIC responsible for the actions of MOPOG because neither FDIC nor First Security assumed MOPOG's liabilities. Therefore, had Northern brought its claims as a counter-suit in FDIC's Toole County case, it could not have prevailed. Instead, it obtained a judgment by default in another court, then brought that judgment back to Toole County to minimize the amount of damages collectible by FDIC. This limits the amount FDIC may recover and, therefore, is a breach of contract liability created by MOPOG but imposed upon MOPOG's successor in interest. While there is a real legal difference between a counterclaim and a "set-off," in this case it is a matter of mere semantics and cannot justify a result which otherwise would not be permitted.

Even assuming *arguendo* that I agreed with the majority's interpretation of § 27-1-502, MCA, this Court does not have

19

sufficient facts before it to conclusively determine that the statute is applicable in this case. The statute clearly states that a set-off is allowed "[w]hen cross-demands <u>have existed</u>. . ." (Emphasis added.) Whether they must exist before the assignment or before the cause of action is not clear. Either way, in this case it cannot be determined with certainty when, if ever, cross-demands were made.

Both parties allege they were damaged by breach of contract, and both can pinpoint with some certainty when they allege the breach occurred. The record does not reflect, however, when each party contacted the other and made a specific <u>demand</u> to recover an amount allegedly owed. The statute requires an actual demand.

This requirement for an actual demand is reasonable, as is a statutory interpretation which places the "demand" before the assignment. A demand from Northern would have put MOPOG on notice of the dispute and of what Northern felt was owed to it. It further would have given MOPOG an opportunity to contest the validity of the demand. We cannot say with certainty that this occurred. If a demand were not made until after the assignment took place, it would be directed at an incorrect party (the innocent assignee instead of the one who caused the damage).

The majority glosses over this point by noting that, if Northern **was** in fact damaged, its right to recover began at the **time it was** damaged; that is, when the contract was breached. Concededly, this was before the assignment and the filing of the Toole County suit. However, § **27-1-502,** MCA, does not refer to a

20

"right to recover," it refers to <u>demands</u>. Without the existence of cross-demands, the statute is inapplicable. Since it cannot be determined from the existing record when, if ever, cross-demands were made, it is unclear how the majority can so confidently hold that § 27-1-502, MCA, applies.

By utilizing this rather obscure statute and obtaining a default judgment against a defunct party, Northern is attempting to minimize the damages it must pay to MOPOG's successor in interest without regard to what amount may justly be owed. This cannot be considered an equitable result.

For these reasons, I would affirm the decision of the District Court.

_____
Justice

21

December 28, 1995

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

KENNETH E. O'BRIEN
Hash, O'Brien & Bartlett
P.O. Box 1178
Kalispell, MT 59903-1178

WARD E. TALBFF
Alexander, Baucus Taleff & Paul, P.C.
P.O. Box 3169
Great Falls, MT 59403

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy