In re TIMOTHY DEAN RESTAURANT
& BAR, a/k/a Timothy Dean's, Inc.,
Debtor.

The Business Bank, Plaintiff,

v.

William Douglas White, Trustee,
et al., Defendants.

Bankruptcy No. 01–02124.
Adversary No. 02–10080.

United States Bankruptcy Court,
District of Columbia.

March 28, 2006.

Linda D. Regenhardt, Gary and Goodman, Limited, Vienna, VA, for Debtor.

*DECISION REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND CROSS–MOTION FOR SUMMARY JUDGMENT*

S. MARTIN TEEL, JR., Bankruptcy Judge.

The Business Bank (the "Bank"), which lent money to the debtor, Timothy Dean's, Inc., brought this proceeding against William White, the trustee of the debtor's estate under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and SLT Realty Limited Partnership, doing business as the St. Regis Washington Hotel (the "Hotel"), the debtor's former landlord. The Bank seeks a determination of the extent, priority, and validity of its lien and other interests in various properties owned or formerly owned by the debtor: specifically, (1) a $66,666.67 security deposit currently in the possession of the Hotel; (2) guest charges and receivables owed to the debtor by the Hotel; (3) silverware purchased by the debtor using a check written by the Hotel for $12,500.00; (4) the proceeds of a settlement agreement entered into by the Hotel and the chapter 11 trustee (the "Settlement Agreement"); and (5) the proceeds of the sale of some of the debtor's wine inventory.

Although the Bank's request seems simple enough on its face, it raises complicated legal issues involving the interpretation and application of both the current and former versions of the Uniform Commercial Code (the "UCC"), most of which were not addressed in the parties' briefs. Consequently, the court has taken longer than it would have liked to finish this decision. Having explored and addressed the numerous complicated issues presented in this case, the court is now prepared to resolve the pending motions for summary judgment with respect to each of the five items at issue before the court.

## I

The following facts are undisputed. Pursuant to a lease agreement entered into on April 14, 2000 (the "Lease"), the debtor leased and operated a restaurant at the Hotel. The Bank was the debtor's principal lender. To secure their claims against the debtor, both the Bank and the Hotel held security interests in various property of the debtor, and both filed financing statements.

Prior to or upon execution of the Lease by the debtor and the Hotel, the debtor deposited $66,666.67 with the Hotel as a security deposit pursuant to the terms of the Lease (Lease ¶¶ 1.1(p) & 21.1). The Lease provided that

> [The Hotel] shall arrange for the Security Deposit to be deposited into an interest bearing account. [The Hotel] shall be entitled to deduct from the amounts so deposited, any administrative fees incurred by [the Hotel] in connection with the establishment and/or maintenance of the account so established.

(*Id.* at ¶ 21.1).

The Hotel has continuously held the debtor's security deposit in an account with Harris Bank under its sole and exclusive control and possession (Hotel Statement of Facts ¶ 5).[1] The debtor also granted the Hotel a security interest in certain personal property, which the Hotel perfected by filing a financing statement on February 13, 2001.

On May 11, 2000, the Bank agreed to lend the debtor $150,000.00. As security for the loan, the debtor granted the Bank a security interest in certain of the debtor's assets in an agreement executed by both parties (the "Security Agreement"), and the Bank filed financing statements in May and September of 2000. To facilitate the Bank's loan to the debtor, the Hotel contemporaneously entered into an agreement with the Bank that subordinated the Hotel's liens and security interests in certain property of the debtor to the Bank's secured interests (the "Subordination Agreement").

On August 24, 2001, the debtor signed a promissory note payable to the Hotel in the amount of $58,231.34. The debtor executed the note because it had not complied with its obligations under the Lease and owed $58,231.34 to the Hotel as of that August. Under the provisions of the note, the debtor was to make two payments under the note in October of 2001, two additional payments in November of 2001, and three payments in December of 2001.

On October 16, 2001, the debtor commenced its bankruptcy case under chapter 11 of the Bankruptcy Code. One month later, the court entered an order granting the Hotel relief from the automatic stay imposed by 11 U.S.C. § 362 so that the Hotel could exercise its right to set off asserted pre-petition debt owed to the debtor against asserted pre-petition debt owed by the debtor to the Hotel (the "Stay Relief Order"). On January 7, 2002, the

---

1. Local Bankruptcy Rule 7056–1 provides in pertinent part that "[i]n determining a motion for summary judgment, the [c]ourt may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LOCAL BANKR. R. 7056–1(h). As the Bank does not dispute paragraph five of the Hotel's Statement of Material Facts, the court will treat the facts alleged in that para-

graph as having been admitted by the Bank. In any event, the Lease itself contemplates that the Hotel remain in control of the security deposit, stating that the security deposit is to be deposited with the Hotel, that the Hotel can "use, apply or retain all or any part of the Security Deposit" in the event of a default by the debtor, and that the Hotel will be in a position to "deliver the Security Deposit" to any purchaser of the Hotel's premises or to the debtor (Lease ¶ 21.1).

court entered another order allowing the debtor to use the proceeds of its receivables for its current operations, including payroll and other expenses incurred in the ordinary course of business (the "Cash Collateral Order"). Both the Hotel and the Bank consented to this relief.

The Cash Collateral Order gave the Bank a replacement lien on new receivables for the use of its collateral on a dollar for dollar basis and ordered the debtor to continue to make payments in the form of setoffs to the Hotel under the Lease and promissory note. The court also granted a separate motion filed by the Hotel that authorized the Hotel to exercise its right to set off post-petition obligations owed by the Hotel to the debtor against post-petition amounts owed to the Hotel by the debtor (the "Adequate Protection Order").

Even after offsetting its debts to the debtor, the Hotel asserted a pre-petition claim of $20,563.88. In addition, the Hotel sought damages for "missing silver, china, glass and linens" in the amount of $56,578.94, for a total claim of $77,142.82. The Hotel exercised a post-petition setoff of its remaining claims as calculated in the Hotel's Exhibit 2 (affidavit of Firdaus Kadir, Controller of the Hotel) and Exhibit 16 (copies of periodic accounts).

On March 28, 2002, the court ordered the appointment of a chapter 11 trustee. On May 2, 2002, the court approved a settlement agreement between the Hotel and the chapter 11 trustee that resolved outstanding disputes regarding the debtor's motion to assume the Lease and the Hotel's motion for relief from the automat-

ic stay to terminate the Lease (the "Settlement Agreement"). Pursuant to the terms of the Settlement Agreement, the Hotel was to pay the chapter 11 trustee the sum of $135,000.00 subject to reduction for inventory losses, unpaid rent, and damages to the premises, as well as any liquor charges. The order approving the Settlement Agreement was subsequently modified by an order entered on May 29, 2002, which allowed the Bank to assert any purported interests it might have in the security deposit, in guest charges, and in up to $118,000.00 of the proceeds paid to the chapter 11 trustee.

The debtor's case was converted to a chapter 7 case on July 16, 2002, and White was appointed as the chapter 7 trustee on July 22, 2002. White does not dispute that either he or the chapter 11 trustee sold some of the debtor's wine inventory for the benefit of the estate.

II

The Hotel and White have filed motions for partial summary judgment with respect to the property described above, and the Bank has filed a cross-motion for summary judgment in addition to its oppositions to those motions.[2] Pursuant to Rule 56 of the Federal Rules of Civil Procedure as incorporated by FED. R. BANKR. P. 7056, summary judgment may be granted in one party's favor if the moving party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Applying Rule 56 to the issues before the court, and for the reasons set forth below,[3] the court concludes that:

2. This court has subject matter jurisdiction under 28 U.S.C. § 1334(b) to resolve the disputes because their resolution will determine the amount of unsecured claims that the Bank and the Hotel are entitled to assert against the estate.

3. Although the Bank's cross-motion for summary judgment was filed after the final day for filing dispositive motions, the court finds such delay excusable. The extension of time is minimally prejudicial to the Hotel and furthers legitimate interests of judicial economy.

- the Hotel's interest in the debtor's security deposit is superior to that of the Bank, and that interest is unaffected by the Subordination Agreement;

- the Hotel properly set off pre-petition guest charges owed to the debtor notwithstanding the Bank's security interest in those amounts, and the Bank lacks standing to contest the Hotel's setoff of post-petition guest charges because the Bank has no interest in those charges;

- the Hotel is entitled to the return of silverware worth $12,500.00;

- White is entitled to the proceeds of the Settlement Agreement because the Bank's lien does not encompass property acquired by the debtor post-petition or the proceeds of such property and the Cash Collateral Order does not alter the scope of the Bank's lien; and

- the Bank is not entitled to summary judgment with respect to the proceeds of the debtor's wine inventory because it has not produced evidence demonstrating that the proceeds derive from wine purchased between May 15, 2000, and October 17, 2001.

A. *The Debtor's Security Deposit under the Lease*

The court will grant the Hotel's motion for partial summary judgment with respect to the security deposit and deny the Bank's cross-motion for summary judgment on the same issue. Although the Hotel may not set off the debtor's security deposit against the debtor's debts to the Hotel, the Hotel possesses a perfected security interest in the security deposit that is superior to any interest asserted by the Bank. Moreover, because the Bank does not have a secured interest in the security deposit at all under the former UCC provi-

sions and other law governing that agreement, its Subordination Agreement with the Hotel does not confer upon it any priority over the rights of the Hotel.

1. *The Hotel's asserted right of setoff*

The Hotel argues that its pre-petition claims against the debtor (after accounting for setoffs against other amounts owed the debtor) exceed the amount of the security deposit, and that, as a matter of law, this vitiates any interest that the debtor or the bankruptcy estate has in those funds and precludes the Bank from enforcing any security interest in, or other lien on, the security deposit. The court rejects this argument.

The Hotel's argument presumes that upon paying the Hotel the security deposit, the debtor transferred title to those funds to the Hotel, with the Hotel as lessor promising in return to refund the deposit at the end of the Lease less amounts owed by the debtor as lessee under the terms of the Lease. This would place the lessor and the lessee in a debtor-creditor relationship with respect to the security deposit, which would allow the lessor to set off the amounts owed under the deposit against other amounts owed to the lessor by the lessee. Most courts to consider the issue, including (at least implicitly) this one, have endorsed this notion. *See In re Inslaw, Inc.*, 81 B.R. 169, 170 (Bankr.D.D.C.1987) (rejecting characterization of security deposit as trust *res* rather than conditional debt owed by lessor to lessee); *In re Jarvis Kitchenware of D.C., Inc.*, 13 B.R. 230, 232 (Bankr.D.D.C. 1981) ("[W]hen rent is owed post-petition by an estate and there are no pre-petition arrearages, the trustee is entitled to set-off the security deposit owed to the debtor with the post-petition rent due from the trustee.").[4]

4. *Accord Personal Fin. Services v. Gen. Motors,* 169 F.Supp.2d 49, 52 (D.Conn.2001) (apply-

Under some circumstances, however, the payment of a security deposit may not effect a transfer of title. For example, numerous states as well as the District of Columbia have passed laws or regulations mandating that security deposits be held by the lessor in trust for the lessee. *See, e.g.,* D.C. MUN. REG. § 14–308 (residential leases); *see also, e.g.,* GA. CODE § 44–7–31. Alternatively, the parties to a lease may create a trust through an express agreement that uses a security deposit as the *corpus* for the trust. *See Personal Fin. Services,* 169 F.Supp.2d at 53; *Yeager,* 719 So.2d at 212–13. In either case, the lessor acts as the trustee, not the owner, of the security deposit, and title to the deposit remains with the lessee.

As noted above, the District of Columbia's Municipal Regulations address the rights of a landlord and a tenant with respect to a security deposit under a *residential* lease, *see* D.C. MUN. REG. § 14–308, and the District of Columbia Code contains similar provisions. *See* D.C. CODE § 42–3502.17. But the court could find no regulations or statutes addressing the rights of a landlord and a tenant in a security deposit under a *commercial* lease. "Since there is no state statute directly applicable, the court looks to the plain language

of the lease agreement." *Personal Fin. Services,* 169 F.Supp.2d at 53.

Section 21.1 of the Lease sets forth the terms governing the debtor's security deposit to the Hotel. That section states that the debtor "has deposited the Security Deposit [5] with [the Hotel] as security for the full and faithful performance of every provision of this Lease to be performed by [the debtor]," that the Hotel "shall arrange for the Security Deposit to be deposited into an interest bearing account," and that if the debtor "shall fully and faithfully perform every provision of this Lease to be performed by [the debtor], the Security Deposit, accrued interest, or any balance thereof shall be returned to [the debtor] upon the expiration of this Lease."

This arrangement constitutes an express trust under District of Columbia law.[6] As the D.C. Court of Appeals explained in *Cabaniss v. Cabaniss,* 464 A.2d 87 (D.C. 1983):

> The elements of a trust ... are the following: 1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; 2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for his benefit;

---

ing Connecticut state law); *Wiskup v. Liberty Buick Co., Inc.,* 953 F.Supp. 958, 971–73 (N.D.Ill.1997) (applying Illinois law); *Yeager v. Gen. Motors Acceptance Corp.,* 719 So.2d 210, 212–13 (Ala.1998); *State v. Larson,* 605 N.W.2d 706, 712 (Minn.2000); *but see In re Cold Harbor Associates, L.P.,* 204 B.R. 904, 912–13 (Bankr.E.D.Va.1997) (holding that tenant was not a creditor of debtor-landlord based on security deposit because, under Virginia Supreme Court's reading of Virginia common law, payment of security deposit created a trust relationship, not a creditor-debtor relationship).

5. Section 1.1(p) of the Lease describes the "Security Deposit" as "$66,666.67 (equal to 4 month[s] of initial Minimum Base Rent)."

6. The Lease designates the law of the District of Columbia as the governing law for purposes of construing the rental agreement. The Security Agreement between the Bank and the debtor, on the other hand, designates Virginia law as the governing law, as does the Subordination Agreement between the Bank and the Hotel. Accordingly, the court relies on District of Columbia law with respect to its interpretation and enforcement of the Lease and relies on Virginia law with respect to its interpretation and enforcement of the Security Agreement and the Subordination Agreement.

[and] 3) trust property, which is held by the trustee for the beneficiary.

*Id.* at 91; *see also Air Transport Ass'n of Am. v. Prof'l Air Traffic Controllers Org. (In re Prof'l Air Traffic Controllers Org. (PATCO)),* 26 B.R. 337, 342 (Bankr.D.D.C. 1982) (defining a trust under District of Columbia law by reference to the Restatement of Trusts).

▮▮▮ The Lease satisfies all three elements of an express trust under D.C. law. It requires the Hotel (the trustee) to hold the Security Deposit (the trust *res*) in an interest-bearing account for the benefit of the debtor (the beneficiary).[7] The Lease may not use the term "trust" explicitly, but, then again, "[n]o particular form of words or conduct is necessary to manifest an intention to create a trust." *Id.*[8] All that is required is "the settlor's manifestation or external expression of his intention to create a trust . . . ." *Id.* Section 21.1 of the Lease is just such an expression.

Because the debtor's security deposit is held in trust by the Hotel, title to the deposit remains with the debtor. Consequently, the debtor has no "claim" against the Hotel for the Hotel to set off. The Hotel's argument in this regard is rejected.

2. *Priority of interests of the parties*

While the Hotel cannot set off the amounts held in the Harris Bank deposit account against debts owed by the debtor to the Hotel, it does have an interest in the account superior to that of the Bank notwithstanding the Subordination Agreement between the parties. The Hotel possesses a perfected security interest in the Harris Bank deposit account under the prior version of Article 9 of the UCC,[9] which governs this proceeding with respect to the Hotel's rights *vis à vis* the debtor's security deposit.[10] The Bank, on the other hand, has no lien or security interest in the security deposit under applicable law. Moreover, because the Subordination

---

7. The requirement in the Lease that the Hotel place the security deposit in an interest-bearing account strongly indicates that the parties intended to create a trust rather than a transfer of title subject to divestment. *See In re Center Apartments, Ltd.,* 277 B.R. 747, 749 (Bankr.S.D.Ohio 2001) (holding that Ohio statute requiring landlord to place security deposits in interest-bearing account created a trust in favor of the tenants in large part because " '[a] provision for the landlord's payment of interest on [a security] deposit until it is applied to the payment of rent or retained as liquidated damages for a default by the tenant indicates that title to the deposit remains in the tenant until it is properly applied' ") (quoting 16A AM. JUR. PL. & PR. *Landlord and Tenant* § 333).

8. *See also In re Prof'l Air Traffic Controllers Org. (PATCO),* 26 B.R. at 343 (discounting "mere fact that the terms 'trust' or 'trustee' were not specifically employed in the actual drafting" of a corporate resolution in holding that resolution created an express trust).

9. Both the former and current versions of the UCC have been adopted by the District of Columbia and Virginia. While the court will cite to the appropriate jurisdiction's version of the UCC with respect to each party's interest, it need hardly do so given that the two jurisdictions' versions of the UCC are identical in all material respects.

10. Article 9 was revised effective July 1, 2001, after the transactions at issue here but before the commencement of this adversary proceeding. Although the revised UCC applies to transactions entered into before July 1, 2001, *see* D.C. CODE § 28:9–702; VA. CODE § 8.9A–702, if the relative priorities of the parties were established prior to July 1, 2001, former Article 9 governs priority. D.C. CODE § 28:9–709(a); VA. CODE § 8.9A–709(a). Here, both the Hotel's and the Bank's actions to attempt to gain and perfect a security interest in the Harris bank deposit account occurred prior to July 1, 2001. Accordingly, former Article 9 controls. *See In re New Haven Foundry, Inc.,* 285 B.R. 646, 649 (Bankr.E.D.Mich.2002); *Consol. Nutrition, L.C. v. IBP, Inc.,* 669 N.W.2d 126, 132 (S.D.2003).

Agreement only reaches secured rights held by the Bank, it has no effect with respect to the debtor's security deposit. The court will grant summary judgment in favor of the Hotel with respect to the debtor's security deposit.

(a) *Nature of the Hotel's interest*

Pursuant to former § 9–203 of the UCC, a security interest attaches to collateral when three requirements are met: (1) the creditor gives value to the debtor; (2) the debtor has rights in the collateral in which it is conveying a security interest; and (3) the debtor has signed a Security Agreement that contains an adequate description of the collateral or the secured party has possession of the collateral. D.C. CODE § 28:9–203 (amended 2000). The debtor's security deposit consisted of a money deposit to the Hotel that was later placed in an account maintained at Harris Bank (Lease §§ 1.1(p) & 21.1). The court must determine whether the Hotel held a security interest with respect to the security deposit in both forms (money and a bank deposit account).

(i) *The Hotel's interest in the deposited cash*

The Hotel clearly satisfied all of the requirements under § 9–203 with respect to the money deposited by the debtor with the Hotel. The Hotel gave value (in the form of the debtor's rights under the Lease) in exchange for collateral ($66,666.67) belonging to the debtor. Moreover, the Hotel had both a signed Security Agreement (the Lease) and, as recited by the Lease, was in initial possession of the security deposit money, which was to be deposited into an interest bearing account.[11]

■ The Hotel also perfected its security interest in the money. With exceptions of no relevance here, a security interest in money can only be perfected by obtaining possession under the former UCC. *See* D.C. CODE § 28:9–304(1) (amended 2000). Accordingly, by taking possession, the Hotel both created and perfected a security interest in the money deposited by the debtor.

(ii) *The Hotel's interest in the deposit account*

■■ Once the Hotel placed the debtor's security deposit in an account at Harris Bank, the debtor's security deposit became a "deposit account"[12] for purposes of the UCC subject to different UCC provisions regarding attachment and perfection of a security interest.[13] Under former

---

11. The Lease indicated in clear terms that the Hotel was to have possession of the security deposit. No party disputes that the debtor paid the security deposit money to the Hotel. There is thus no genuine issue of material fact as to the Hotel's having obtained possession of the security deposit money.

12. A deposit account is defined as "a demand, time, savings, passbook, or like account maintained with a bank ... other than an account evidenced by a certificate of deposit." D.C. CODE § 28:9–105(e) (amended 2000).

13. The term "money" means "a medium of exchange authorized or adopted by a domestic or foreign government ...." D.C. CODE § 28:1–201(24). Although some courts have held that an interest in money continues as a

perfected security interest in money even after the money is deposited into a bank account, *see, e.g., In re LDM Dev. Corp.*, 211 B.R. 348, 353 (Bankr.D.Minn.1997); *In re O.P.M. Leasing Services*, 46 B.R. 661, 670 n. 5 (Bankr. S.D.N.Y.1985), the decisions reached by these courts, while understandable as a practical matter, do not withstand close analysis. As the Supreme Court observed in *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), once money is converted into a bank account, it ceases to be money. *See id.* at 21, 116 S.Ct. 286 (holding that a bank account is a promise from the bank to the depositor to make payments as directed by the depositor, not money belonging to the depositor and held by the bank).

UCC § 9–306(2), however, the Hotel's security interest in the funds transferred by the debtor "continue[d] ... in any identifiable proceeds" of the original collateral, D.C. CODE § 28:9–306(2) (amended 2000), and the bank account was plainly identifiable proceeds of the funds transferred by the debtor.[14]

Under former UCC § 9–306(3), "[t]he security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor ...." D.C. CODE § 28:9–306(3). Applying this provision to the instant case, the Hotel's security interest in the deposit account initially became a continuously perfected security interest because the security interest in the original collateral (the money) was perfected.

■■■ As for the 10–day period referenced in former UCC § 9–306(3), it never began to run because the proceeds were never "recei[ved] ... by the debtor" as required by § 9–306(3) (Hotel Statement of Facts ¶ 5). D.C. CODE § 28:9–306(3) (amended 2000); *see also Apex Oil Co. v. Tims (In re Armstrong)*, 56 B.R. 781, 787

& n. 2 (W.D.Tenn.1986) (creditor's security interest remained continuously perfected under Tennessee version of the UCC § 9–306(3) because the debtor never received the proceeds, which were placed in a deposit account over which the debtor had no control); *Farmers & Merchants Nat'l Bank v. Fairview State Bank*, 766 P.2d 330, 334 (Okla.1988) (10–day period of Oklahoma's version of § 9–306(3) did not apply because debtors never received proceeds).[15] As the *Armstrong* court explained:

> Third parties who contemplate extending credit on the basis of proceeds from collateral subject to a perfected security interest do so at their own risk when the debtor has never received the proceeds. This is especially true for cash proceeds, in which a security interest may be perfected only by the creditor taking possession.

*Armstrong*, 56 B.R. at 787 (citing *First State Bank v. Morristown Lincoln–Mercury, Inc.*, 27 B.R. 801 (Bankr.E.D.Tenn. 1983)).

The Hotel's security interest both attached to the money used to establish the security deposit and was perfected at the outset. Its security interest attached to

---

**14.** The bank account constitutes "proceeds" of the original funds because it was property acquired in exchange for money, making the account a form of "cash proceeds." *See* D.C. CODE § 28:9–306(1) (amended 2000) (defining "proceeds"). Under former UCC § 9–203(3), the Lease, which served as a security agreement between the debtor and the Hotel, effectively gave the Hotel the rights to proceeds provided by former § 9–306. D.C. CODE § 28:9–203(3) (amended 2000).

**15.** Some courts have held that a lack of receipt by the debtor defeats attachment in the proceeds of secured collateral. *E.g., Eastern Idaho Prod. Credit Ass'n v. Idaho Gem, Inc.*, 122 Idaho 946, 842 P.2d 282, 286–87 (1992) ("[T]he more reasonable interpretation of 'proceeds' in which a security interest may be

retained ... extends only to those proceeds received by the debtor."). Under the majority view of former § 9–306(2), however, the proceeds need not have been received by the debtor in order for the Hotel's security interest to attach to the proceeds. *See, e.g., Bank of Oklahoma, N.A. v. The Islands Marina, Ltd.*, 918 F.2d 1476, 1481 (10th Cir.1990); *Fleet Capital Corp.*, 2002 WL 31174470, *35–36 (S.D.N.Y. Sept. 26, 2002) (collecting cases); *First State Bank v. Clark*, 635 N.W.2d 29, 31–34 (Iowa 2001). This court agrees with the majority of courts that the latter interpretation "gives meaning to all the words in the statute and best accomplishes the goal of the statute to trace proceeds subject to a security interest." *First State Bank*, 635 N.W.2d at 33.

the Harris Bank deposit account. Finally, the Hotel's security interest remained continuously perfected in the Harris Bank deposit account because the security interest in the money had been perfected and the debtor never obtained possession of the bank account.[16] The Hotel has a perfected secured interest in the deposit account.

### (b) *Nature of the Bank's interest*

The Bank also alleges that it has a lien on the security deposit. For the Bank to have a valid lien, however, it must have taken steps to ensure that its lien was attached and perfected under either the UCC or under common law depending upon the classification of the collateral. The Bank's failure to take such steps forecloses its assertion of lien on the security deposit.

### (i) *The Bank's interest under the former UCC*

Under the former version of the UCC, the Bank failed to obtain a security interest in the money transferred by the debtor to the Hotel. For a party to obtain an Article 9 security interest, § 9–203(a) of the former UCC requires that the party either attach the collateral or sign a Security Agreement containing a description of the collateral. VA. CODE § 8.9–203(a) (repealed 2001). The Bank never had possession of the money transferred by the debtor to the Hotel and did not describe a security interest in money in its Security Agreement with the debtor.[17]

Instead, the Security Agreement's Schedule A lists the debtor's "rights to receive any payments in money or in kind" as pertinent collateral. But a security interest in the right to receive a payment is not the same as a security interest in money itself. *See In re Megamarket of Lexington, Inc.*, 207 B.R. 527, 533 (Bankr. E.D.Ky.1997) (" 'Money' means currency; it does not mean the right to receive currency. This is supported by the fact that a security interest in 'money' can be perfected only by the secured party's taking possession.") (citations omitted); *Vienna Park Properties v. United Postal Savings Ass'n (In re Vienna Park Properties)*, 976 F.2d 106, 116 (2d Cir.1992).[18]

Schedule A of the Security Agreement also lists "deposit accounts" as collat-

---

**16.** Even if the security interest in money had never been perfected (*e.g.*, if the debtor had retained possession of the money until it was placed into the Harris Bank account), the Hotel's exclusive control over the Harris Bank deposit account gave it a secured interest in the deposit account under the applicable common law discussed in part II.A.2.b.ii below.

**17.** The Bank and Debtor entered into the Security Agreement on May 15, 2000. The parties filed a financing statement for items listed under Schedule A of that agreement on July 3, 2000, and filed another financing statement for items listed under Schedule B of the agreement on September 21, 2000.

**18.** The Bank has a security interest in the debtor's general intangibles, and the debtor's contractual rights under the Lease arguably constitute a general intangible as defined by former UCC § 9–106. However, the collater-

al deposited with the Hotel was money, and it is properly classified as money, not a general intangible. *LDM Dev. Corp.*, 211 B.R. at 353–54. The debtor's contractual rights under the Security Agreement (for example, any claim the debtor would have if the Hotel had improperly dissipated the money) are one stage removed from the debtor's ownership rights in the money itself, in which only the Hotel had a security interest. Even if the debtor's rights to a refund of the money were viewed as a contractual right instead of an ownership right, the Bank's security interest in that contractual right would only reach the debtor's residual rights in the security deposit after the Hotel's security interest ceased to exist. In other words, the debtor's only contractual right would have been the right to be paid when the security deposit no longer was needed to protect the Hotel.

eral securing the Bank's loan to the debtor. It therefore appears that the Bank has a security interest in the deposit account under the current version of the UCC. *See* VA. CODE § 8.9A–203. Under the *prior* version of Article 9, however, security interests in deposit accounts as *original* collateral do not fall within the scope of Article 9. *See* VA. CODE § 8.9–104(1) (repealed 2001). In other words, the former Article 9 only governed transactions creating a security interest in a deposit account if the property in the deposit account was the proceeds of collateral in which the secured party had an Article 9 security interest. *See id.; see also* Gerald T. McLaughlin, *Security Interests in Deposit Accounts: Unresolved Problems and Unanswered Questions Under Existing Law,* 54 BROOK. L. REV. 45, 46 (1988). Consequently, the Bank cannot assert a security interest—perfected or unperfected—under the former UCC.

#### (ii) *The Bank's interest under the common law*

Prior to the 2001 amendment to Article 9, the only means of obtaining a security interest in a deposit account that was not the proceeds of secured collateral was through the common law, chiefly through the mechanism of the pledge. "[A] pledge is a transfer of property as security for a debt." *Nat'l City Bank v. Toffel (In re Ala. Land & Mineral Corp.),* 292 F.3d 1319, 1325 (11th Cir.2002). The creditor's interest in the pledge is created "by a bailment to secure payment of a debt or performance of a service." *All American Auto Salvage v. Camp's Auto Wreckers,* 146 N.J. 15, 679 A.2d 627, 630 (1996);

*accord Koch v. Han–Shire Investments, Inc.,* 273 Minn. 155, 140 N.W.2d 55, 62 (1966); *Duncan Box & Lumber Co. v. Applied Energies, Inc.,* 165 W.Va. 473, 270 S.E.2d 140, 143–44 (1980). According to the Supreme Court, there are three elements necessary to create a pledge: (1) a debt; (2) an offer of property to secure that debt; and (3) transfer of that property from the debtor to the creditor. *Mechanics' & Traders' Ins. Co. v. Kiger,* 103 U.S. 352, 356, 26 L.Ed. 433 (1880).[19]

The Bank cannot satisfy the third requirement for a pledge set forth by the Supreme Court in *Kiger.* As noted above, the Hotel had exclusive access to the deposit account from the moment of its inception (although it did not "receive" the account). The Bank had no access to, let alone control over, the Harris Bank deposit account. And unlike a security interest under the UCC, which might attach even though it is not perfected, a pledge does not come into existence at all until it is "perfected" by the transfer of property to the creditor because a creditor's security arises from her possession of the collateral, not from the agreement of the parties. Consequently, the Bank has no interest whatsoever in the Harris Bank deposit account under the UCC or under Virginia common law for purposes of determining which creditor holds a priority interest in the debtor's security deposit.

#### (c) *Effect of the Subordination Agreement*

The lynchpin of the Bank's priority argument is its Subordination Agree-

---

**19.** Revised Article 9 essentially codifies the common law principles of the pledge for purposes of perfecting a lien on a deposit account. Comment 5 to § 9–312 of the UCC makes clear that as under "certain non-UCC law," dominion and control over the deposit account that prevents the debtor from disposing of the funds would qualify as control (although in some circumstances control can exist even if the debtor has some access to the funds). VA. CODE § 8.9A–312 cmt. 5.

ment with the Hotel.[20] That agreement provides that the Hotel "consents to the Bank's security interest in the Collateral [as defined in the Subordination Agreement]" and "absolutely and unconditionally subordinates any claim against the Collateral which [the Hotel] might have by virtue of the Lease."[21] In other words, the Subordination Agreement guarantees that *any* "security interest" held by the Bank—no matter when or if perfected—will have priority over the perfected lien of the Hotel.

The rights of the parties turn on the meaning of the phrase "security interest." If the phrase refers to security interests as defined by the former UCC, then the Subordination Agreement does not apply to the debtor's security deposit because (for the reasons discussed above) the Bank has no security interest whatsoever in the debtor's deposit. If the phrase is interpreted according to the current UCC, then the Subordination Agreement applies to the debtor's security deposit because (as was also discussed above) the Bank has been granted a security interest in all "deposit account[s]" of the debtor, including the Harris Bank deposit account.

The court concludes that the phrase "security interest" should be interpreted according to the provisions of the former UCC. The Subordination Agreement was written in May of 2000, almost a year before the changes made by the UCC went into effect. Presumably, the Hotel and the Bank understood the terms of their agreement to coincide with the definitions of the UCC as it existed at that point in time. Their understanding of the term "security interest" would not have included viewing deposit accounts as the subject of a security interest or lien unless those accounts were the proceeds of another form of secured collateral or were made collateral through a common law device such as a pledge.

This reading of the Subordination Agreement makes sense. The Bank's preferred reading does not. It would be extremely odd for a landlord to subordinate its rights in a security deposit for rent to another creditor's claims. It would be even odder for the parties to agree that the Hotel's secured interest in the debtor's security deposit would not be subordinated while the deposit was still in the form of money, but would suddenly become subject to subordination once the Hotel deposited the money in a deposit account. These irregularities make it difficult to believe that the parties intended the term "security interest" to encompass the landlord's security deposit.

---

20. A subordination agreement is an agreement whereby two parties, both having a security interest in the same collateral, decide to reverse the priority of the liens on that security interest. Official comment 2 to § 1–209 of the former UCC explains that subordination agreements are enforceable as contracts and do not create a new security interest unless explicitly created in the agreement. VA. CODE § 8.1–209 cmt. 2 (repealed 2001). The comment further explains that upon the bankruptcy of a debtor, "dividends otherwise payable to the subordinated creditor are turned over to the superior creditor." *Id.* This "turn-over" practice often has been described as an " 'equitable lien,' 'equitable assignment,' or a 'constructive trust.' " *Id.* Regardless of the label given to the "turn-over" practice, "the practice is essentially an equitable remedy." *Id.*

21. The Subordination Agreement restated this point by providing:

> [The Hotel] intends hereby that ... the rights of the Landlord ... whether arising by operation of law or pursuant to provisions in the Lease, shall be as though the Bank's *security interest* in the Collateral was perfected prior to the execution of the Lease[.]

(Subordination Agreement § 3 (emphasis added)).

In short, the Bank cannot use its Subordination Agreement to rearrange the priority of interests in the debtor's security deposit set forth under the old UCC (*i.e.*, the secured interest held by the Hotel versus the rights of the Bank as only an unsecured creditor of the debtor's estate). The Hotel is entitled to summary judgment on this issue.

## B. *Guest Charges & Receivables*

The Hotel and the Bank both ask for summary judgment with respect to the value of the Bank's purported interest in certain pre-petition and post-petition guest charges and accounts receivable owed to the debtor by the Hotel.[22] The Bank alleges in its complaint that there are "substantial funds" due from the Hotel to the debtor "due to failure to pay for food and drink supplied through room service" (Compl. ¶ 8(d)). The Hotel alleges that it no longer owes any amount to the debtor through both setoff and direct payment to the debtor. The Bank, in turn, contests the validity of the Hotel's setoffs.

### 1. *Pre-petition guest charges*

The Bank asks that the court value its lien in the proceeds of certain causes of action formerly held by the debtor based on room service charges that the Hotel never remitted to the debtor. The Hotel set these charges off against pre-petition debts owed by the debtor to the Hotel.[23] The Bank argues that, under the terms of the Subordination Agreement, its security interest[24] in the proceeds of the debtor's causes of action for unpaid service charges were not subject to the Hotel's setoff rights. If correct, the Bank could conceivably pursue a cause of action against the Hotel for the unpaid guest charges.

#### (a) *Scope of the Subordination Agreement*

The Subordination Agreement, it will be recalled, states that the Hotel "absolutely and unconditionally subordinates any *claim* against the Collateral which [it] might have by virtue of the Lease." (Emphasis added). Under District of Columbia law,[25] however, a right to setoff is not a "claim" at all, but rather "is an equitable defense which can reduce or defeat the

---

**22.** Pursuant to Article 19 of the Lease, the debtor would provide room service to guests of the Hotel and would permit hotel guests to charge the fees for this service to their room account. In turn, the Hotel would pay the debtor for these guest charges at agreed-upon intervals (less a 4% handling charge).

**23.** The Stay Relief Order provided that it was:

> ORDERED, that the stay imposed by 11 U.S.C. § 362(a)(7) is hereby terminated to allow [the Hotel] to exercise its right to setoff [*sic*] its asserted pre-petition debt to Debtor of $31,367.91 against Debtor's asserted pre-petition debt to [the Hotel] of more than $53,218.85, but this does not adjudicate the amount of claims of the parties against each other.

**24.** Without question, the Bank had a security interest in both the guest charges account held by the debtor and the debtor's unliqui-

dated cause of action against the Hotel for breach of contract due to the Hotel's failure to remit certain guest charges owed to the debtor. Choses in action are general intangibles under § 9–102 of the UCC, *see* Va. Code § 8.9A–102(42), and the Bank had an attached and perfected security interest in the debtor's general intangibles. Moreover, even if the liquidated value of the debtor's breach of contract claim constituted the "proceeds" of the claim, "a security interest attaches to any identifiable proceeds of collateral" under § 9–315 the UCC, *see* Va. Code § 8.9A–315(a)(2), and "[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." *Id.* at § 8.9A–315(c).

**25.** Although the Subordination Agreement is governed by Virginia law, *see* note 5, *supra*, the setoff rights of the Hotel are defined by reference to D.C. law in the first instance.

opposing party's claim." *Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n*, 641 A.2d 495, 508 (D.C.1994); *see also Wright v. McCann*, 122 A.2d 334, 335 (D.C.1956) ("A setoff is a partial or entire defense, affirmative in nature, to an action for damages and as such must be pleaded."). If this description by the D.C. Court of Appeals were to be taken at face value, the Hotel's setoff rights would not be subject to the Subordination Agreement.[26]

The court recognizes that some courts consider setoff to be a type of claim rather than a defense *per se*. *See, e.g., Granmo v. Superior Court*, 122 Ariz. 510, 596 P.2d 36, 38 (1979) ("A counterclaim in the nature of a setoff . . . is not a defense which goes to the justice of the lender's claim; it is an affirmative action which claims damages for an independent wrong."); *Charles S. Martin Distributing Co., Inc. v. Bernhardt Furniture Co.*, 213 Ga.App. 481, 445 S.E.2d 297, 300 (1994) ("The assertion of a set-off against the amount owed is not a defense, but is a claim for affirmative relief."). At the same time, other courts have held unequivocally that a setoff is *not* a variant species of the counterclaim. *See, e.g., FDIC v. Northern Montana Gas Co.*, 274 Mont. 371, 908 P.2d 1357, 1362 (1995) (pointing out the substantive difference "between a counterclaim for affirmative relief" and a setoff, "which simply seeks to reduce the plaintiff's recovery dollar-for-dollar"); *Nancy's Prod., Inc. v. Fred Meyer, Inc.*, 61 Wash.App. 645, 811 P.2d 250, 253 (1991) (characterizing setoff as being "in the nature of a defense, as distinguished from a counterclaim[,] which is a demand for affirmative relief"). In the absence of clear authority on this point from the D.C. Court of Appeals, this court is left to speculate whether the term "setoff" refers to a claim or a defense in the District of Columbia.

One rather weak argument for concluding that courts in the District of Columbia consider a setoff to be a type of claim rather than a defense is found in Rule 8 of the D.C. Rules of Civil Procedure, which lists various affirmative defenses that must be pled in a defendant's answer, but does not mention setoffs. *See* D.C.R. CIV. P. 8(c). The rule's exclusion of the term "setoff" suggests that the concept is not subject to Rule 8(c) at all, but rather should be treated like a permissive counterclaim.

However, the list provided in sub-section (c) is intended to be illustrative, not exhaustive. Indeed, numerous *federal* courts have held that defendants must include any setoffs that they intend to assert in their answers in accordance with Rule 8(c) of the *Federal* Rules of Civil Procedure (the basis for D.C.'s Rule 8(c)) notwithstanding the absence of the term "setoff" from the list of defenses provided in the rule. *See, e.g., United States v. Am. Packing & Provision Co.*, 122 F.2d 445, 449 (10th Cir.1941); *J.V. Edeskuty & Associates v. Jacksonville Kraft Paper Co., Inc.*, 702 F.Supp. 741, 749 (D.Minn.1988); *Worster Motor Lines, Inc. v. Lombardo*, 531 F.Supp. 106, 110 (W.D.Pa.1982). If federal courts can apply Federal Rule 8(c) in

---

**26.** The Hotel did not set off amounts owed to the debtor through the pleading of a formal defense in an adjudicative proceeding, nor did it need to do so for its setoffs to be valid. *See Strumpf*, 116 S.Ct. at 289 (citing the "rule followed by a majority of jurisdictions" that a setoff is accomplished when there is "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff"). While the Hotel did not raise its setoff rights in an answer to a formal complaint filed by the debtor, its effectuation of its setoff rights was an informal exercise of those same rights. Thus, the issue of the nature of those rights (*i.e.*, the nature of the setoff right as a type of defense or as a type of counterclaim) still pertains.

such a manner, there is no reason why D.C. courts could not do the same to the analogous (and identical) local rule.

Moreover, while Rule 8(c) fails to mention setoffs, Rule 5(b) of the District's Landlord and Tenant Rules expressly mentions setoff as "an equitable defense" that, unlike a counterclaim, may be asserted in landlord/tenant court. In *Shin v. Portals Confederation Corp.*, 728 A.2d 615 (D.C.1999), the D.C. Court of Appeals interpreted Rule 5(b) to permit a defendant to assert allegations of fraudulent misrepresentation and breach of contract as legal defenses even though those allegations could not have been asserted as counterclaims under the rule. *Id.* at 618–19. The court commented in one footnote that "[b]oth recoupment and set-off defenses are really nothing more than requests that the court reduce any award to the plaintiff by any sums owed to the defendant ...." *Id.* at 618 n. 5. Such language does not strike the court as suggesting that setoffs are more like counterclaims than equitable defenses.

Another argument for concluding that D.C. courts treat a setoff as a claim instead of a defense is that although D.C. courts allow defendants in a civil action to assert recoupment or setoff defenses even where claims for affirmative relief on the same grounds would run afoul of the applicable statute of limitations, this exception is limited to defenses that "are inseparable from the underlying claim." *Spriggs v. Bode*, 691 A.2d 139, 143 (D.C.1997). This limitation arguably suggests that the exception applies only to defenses sounding in recoupment, but not to setoffs, which "arise[ ] out of a different transaction from the main claim[ ] by definition." *McGovern v. Martz*, 182 F.Supp. 343, 349 (D.D.C.1960).[27] In other words, setoffs are treated like counterclaims, not affirmative defenses, for purposes of this exception.[28]

The D.C. Court of Appeals has never explained why it imposed the limitation on a setoff other than the obvious injustice that would result from allowing a defendant who was time-barred (at the time that the plaintiff's claims arose) from filing a

**27.** " '[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded.' " *Lofchie v. Washington Square Ltd. P'ship*, 580 A.2d 665, 667 (D.C.1990) (quoting *Bull v. United States*, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935)). It "allows a defendant to defend against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction." 20 AM. JUR. BANKR.2d *Counterclaim, Recoupment, and Setoff* § 5. It differs from setoff in that recoupment is limited to assertions of counter-claims arising out of the same transaction as the underlying claim-in-chief, whereas setoff only requires mutuality of the parties holding claims against each other. In addition, a party may assert a recoupment defense even if that party's cross-claim arose pre-petition and the claim-in-chief arose post-petition (or *vice versa*); this is not possible with setoff. *See Davidovich v. Welton*, 901 F.2d 1533, 1537

(10th Cir.1990); *see also, e.g., United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 395–96 (D.C.Cir.1997) (holding that debtor could recoup pre-petition over-payments against post-petition debts).

**28.** However, the exception to the statute of limitations could arguably be read as encompassing true setoff (as opposed to recoupment) when the parties' course of conduct viewed amounts owed to a plaintiff as not owing to the extent of claims of the defendant that arose before the statute of limitations would have been a defense to the defendant's assertion of its claims. When, upon the commencement of litigation, the statute of limitations becomes a bar to the defendant's affirmatively recovering on its claims, the parties' course of conduct nevertheless mandates allowing the defendant to assert its claims as a defense by way of setoff to the extent they were not time-barred when the plaintiff's claim arose.

claim for affirmative relief to assert that same claim as an affirmative defense no matter how tangential it might be to the litigation at issue. *See Spriggs,* 691 A.2d at 143; *Karr v. C. Dudley Brown & Associates, Inc.,* 567 A.2d 1306, 1311 (D.C. 1989). And while a setoff might be treated like a counterclaim with respect to the applicable statute of limitations, it is treated like a defense in that, like a recoupment defense, "[n]o affirmative recovery is allowed" on a setoff. *Winchester Mgmt. Corp. v. Staten,* 361 A.2d 187, 191 n. 13 (D.C.1976).[29]

In short, there are at least as many reasons to believe that D.C. courts consider setoff to be an affirmative defense as there are to think that these courts have concluded otherwise. Moreover, D.C. courts repeatedly refer to the right of setoff as a "defense" rather than as a "claim." Absent compelling evidence to the contrary, the court is obliged to take these references at face value and assume that the D.C. Court of Appeals knows what it means when it calls a setoff a "defense." Accordingly, the court concludes that the Hotel's setoffs were really informal assertions of affirmative defenses.

Even if the Hotel's setoff rights were considered "claims" under District of Columbia law, the Subordination Agreement would still have no effect on the validity of the Hotel's setoff. The Subordination Agreement clarified that the Bank's secured interest in the debtor's collateral was deemed to have been perfected before the Lease went into effect. *See* n. 21, *supra.* As set forth more fully in the following part II.B.1.b, the prior perfection of a secured interest in property set off by an account debtor does not invalidate setoff rights arising before actual notice of (and a demand for an honoring of) an assignment of the assignor's right to payment to the perfecting creditor.

The Subordination Agreement's subordination of "claims" must be read in that context, particularly in light of the uncertainty that exists (and existed) regarding the nature of setoff as a claim or a defense. Reasonable business people would view the Hotel's and the debtor's arrangement as giving rise to *net amounts* owed as an account receivable to whichever party (the Hotel or the debtor) was owed more, at least until some third party asserted an assignment of the debtor's rights. For all these reasons, the court concludes that the Hotel's right of setoff is not subject to the parties' Subordination Agreement.

(b) *Validity of the Hotel's setoff under the UCC and the common law*

■ Having set aside the red herring that is the Subordination Agreement, the court's focus necessarily turns to the propriety of the Hotel's setoff under the UCC [30] and the common law.

**29.** In contrast, courts in Virginia permit a party asserting a setoff to recover an affirmative judgment for any counterclaim asserted by the defendant in excess of the underlying claim-in-chief. *Nat'l Bank & Trust Co. v. Castle,* 196 Va. 686, 85 S.E.2d 228, 233 (1955) (quoting BURKS' PLEADING AND PRAC. § 241 (4th ed.)). Perhaps not surprisingly, those same courts routinely refer to setoffs as counterclaims rather than as defenses. *See First Nat'l Bank of Louisville v. Master Auto Service Corp.,* 693 F.2d 308, 310 n. 1 (4th Cir. 1982) (applying Virginia law) ("A set-off is a counterclaim arising from an independent claim the defendant has against the plaintiff."); *cf. Piland Corp. v. League Constr. Co., Inc.,* 238 Va. 187, 380 S.E.2d 652, 653 (Va. 1989) (considering "whether Virginia law permits a defendant to set off, by *counterclaim,* an unliquidated debt against a liquidated debt" (emphasis added)).

**30.** Because the court's inquiry is limited on this matter to determining the propriety of the amounts set off by the Hotel, and does not include any consideration as to the priority of the Hotel's interest in the guest charges *vis à vis* the Bank, the court relies on the current

Generally speaking, courts have taken one of two approaches in weighing the legitimacy of a party's setoff of debt secured by a third party. Some courts resolve the issue through recourse to the common law notion that "one who claims a property interest has no right to payment greater than the entity who granted the interest." *In re Nuclear Imaging Sys., Inc.,* 260 B.R. 724, 741 (Bankr.E.D.Pa. 2000) (collecting cases); *see also First Nat'l Bank of Louisville v. Master Auto Service Corp.,* 693 F.2d 308, 314 (4th Cir. 1982) (*"Master Auto"*) (secured creditor, as assignee of debtor, "has no better rights than those of [the debtor]"); *United States v. Cherry Street Partners, L.P. (In re Alliance Health of Fort Worth, Inc.),* 240 B.R. 699, 704 (N.D.Tex.1999) ("a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor"). Under this straightforward approach, the Bank would have no right to retrieve the funds set off by the Hotel because the Bank would not be able to recover monies that could not be recovered by the debtor in the first instance.

Other courts, including the vast majority of courts to have considered the issue in more recent years, look to the UCC for guidance in this area. *See, e.g., First Nat'l Bank of Boston v. Thomson Consumer Electronics, Inc.,* 84 F.3d 397, 399–401 (11th Cir.1996) (*"Thomson"*); *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1190 (7th Cir.1990); *In re Nuclear Imaging Sys., Inc.,* 260 B.R. at 742–43 (collecting cases). Under § 9–404 of the UCC (§ 9–318 of the prior version):

> Unless an account debtor has made an enforceable agreement not to assert defenses or claims, ... the rights of an assignee are subject to:

> (1) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

> (2) Any other defense or claim of the account debtor against the assignor *which accrues before the account debtor receives a notification of the assignment* authenticated by the assignor or the assignee.

D.C. CODE § 28:9–404(1)(a) (emphasis added).

"Subsection (a) [of § 28:9–404(1)], like former [§] 9–318(1), provides that an assignee generally takes an assignment subject to defenses and claims of an account debtor." *Id.* at § 28:9–404 cmt. 2. Because a party asserting a right to setoff (whether formally or informally) is by definition an "account debtor," *Thomson,* 84 F.3d at 400, and because "the courts and the UCC have made no distinction between a party with a security interest in a debtor's accounts receivable and a party who is an assignee of a debtor's accounts receivable," *Bank of Waunakee,* 906 F.2d at 1190, many courts rely upon § 9–404(a) to determine the validity of a party's setoff of secured debt. For these courts, the key question is whether the right to setoff "accrues before the account debtor receives a notification of the assignment ...." D.C. CODE § 28:9–404(a)(2). If the right accrues prior to notice of the assignment, the setoff is valid against the assignee as well; if not, the account debtor may not setoff her claim against the assignee.

At first blush, this rule appears easier to satisfy than the absolute prohibition set forth in cases such as *Master Auto* or *Alliance Health.* So long as a secured creditor gives notice of its interest in the assignor's accounts receivable before the

version of the UCC as adopted by Virginia and the District of Columbia for guidance.

account debtor's right to setoff accrued, the secured creditor's lien would not be subject to any setoffs executed by the account debtor.

■ But the differences between the approach taken in *Master Auto* and *Alliance Health* and the approach taken in the majority of more recent cases are more apparent than actual. The key is the notice requirement of § 9–404(a)(2), which requires the assignee to give *actual* notice of the assignment. This requirement is more difficult than it sounds, as the Fifth Circuit explained in *Estate of Haas v. Metro–Goldwyn–Mayer, Inc.,* 617 F.2d 1136 (5th Cir.1980):

> [I]n order for there to be an effective assignment under [former] § 9–318(3) [now § 9–404(a)], the account debtor must be notified of *two* things. First, he must receive notice that the "amount due or to become due has been assigned." *Second, the account debtor must also be notified that "payment is to be made to the assignee."*

*Id.* at 1139 (quoting *First Nat'l Bank of Rio Arriba v. Mountain States Telephone and Telegraph Co.,* 91 N.M. 126, 571 P.2d 118, 119 (1977)) (emphasis added).[31] This second aspect of the notice requirement necessarily implies that unless and until a creditor with a security interest in a debtor's accounts receivable (or general intangibles, as the case may be) actually gives notice that it is enforcing its security interest in the asset, the secured creditor is subject to any setoff rights that accrue to a third party account debtor.

This second requirement set forth in *Haas* brings reason to an otherwise non-sensical rule. Obviously, an account debtor who receives notice of a demand from a third party for payment of the debt to the third party pursuant to an absolute assignment should not be allowed to offset her assigned debt with amounts owed by the assignor arising out of subsequent transactions. The notice and demand substitute the assignee as the party that the account debtor must treat as entitled to payment of the assigned debt. Once that occurs, an account debtor should no more be allowed to set off the debt that she owes with amounts owed to the account debtor based on subsequent transactions with the assignor than she would be allowed to set off the debt with amounts owed by a complete stranger. In either case, the requisite mutuality between the parties and the debts is destroyed by notice of the assignment and demand for payment of the assigned amounts to the assignee. *See In re Doctors Hospital, Inc.,* 6 B.R. 390, 395 (Bankr. D.D.C.1980) (describing mutuality as being "at the heart" of the setoff doctrine).

Assuming that the assignor serves notice of the assignment and demand for payment, the assignment would not abrogate the setoff rights of the account debtor so much as it would define the scope of those rights with respect to the various parties to the assignment. The account

---

**31.** *Accord Banque Arabe et Internationale D'Investissment v. Bulk Oil (USA) Inc.,* 726 F.Supp. 1411, 1418 (S.D.N.Y.1989); *City of North Miami v. American Fidelity Fire Ins. Co.,* 505 So.2d 511, 512 (Fla.Ct.App.1987). *Haas* relied in large part on § 9–318(3) of the former UCC as the statutory foundation for its secondary notice requirement. That section stated:

> The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee.

This language is now located in § 9–406 of the revised UCC. *See* D.C. CODE § 28:9–406(a). The accompanying comment to the revised rule makes clear that "[n]o change in meaning from former [§] 9–318 is intended" by placing the language from that subsection in revised § 9–406. D.C. CODE § 28:9–406 cmt. 1.

debtor would still be able to set off her transferred debt against any amounts owed to her prior to the notice and demand. If the account debtor entered into separate transactions with the assignor after the assignment, she could set off any claims accruing after the assignment against the assignor directly without regard to the rights of the assignee. And if the account debtor transacted directly with the assignee after the assignment, she would have a right to set off her post-assignment claims against the assignee as well. In other words, the account debtor would always be able to assert her setoff rights against someone as identified by the requirement of mutuality.

Prior to notice that the assignee is to be the recipient of payment, it only makes sense that the account debtor be entitled to continue dealing with the assignor on the understanding that she will be entitled to treat the debt that she owes the assignor as being subject to setoff. This rule is especially necessary in the context of security interests because the granting of a security interest, while technically an assignment under the UCC, (1) does not change the parties to a particular debt like the assignment described above, and (2) may be of an indefinite and perpetual character. In this case, for example, the Bank has a putative security interest in virtually everything that the debtor owns, including all accounts and rights to payment. The debtor's "assignment" to the bank is therefore both indefinite (i.e., unlimited with respect to size) and perpetual (i.e., unlimited with respect to time).

Under these circumstances, a notice requirement bereft of the accompanying requirement of notice of payment to the assignee would deprive an account debtor of any right of setoff whatsoever with respect to claims arising after the assignment. Not only would the account debtor be unable to set off her claims directly against the assignee under § 9–404, she could not even set off her post-assignment claims against her post-assignment debts to the assignor because those post-assignment debts would be deemed to have already been "assigned" to the secured creditor through the granting of the security interest. Moreover, the assignor, having only a contingent interest in the "assigned" claim of the assignee, would not need to step into the shoes of the assignor for purposes of transacting with the account debtor and therefore would not expose herself to liability with respect to that account debtor. In other words, both the assignee and the assignor would enjoy practical immunity from setoffs from the point of assignment forward.

The demand requirement set forth in *Haas* avoids this manifestly unfair formulation. Even after the debtor gave the Bank a security interest in its right to the Hotel guest charges, it was still the debtor that was owed those charges, and it was still the debtor that was responsible for prosecuting its right to those charges. It makes no sense to give the Bank the benefit of having the debtor administer and collect on debt assigned to the Bank while at the same time insulating the Bank from the claims of the parties forced to continue working with the debtor. The Bank cannot have its cake and eat it, too.

In short, the Bank could not cloak itself in the protections of § 9–404 unless and until it seized its interest in the debtor's general intangibles via notice and demand to the Hotel and pursued the debtor's cause of action against the Hotel for breach of contract with respect to the unpaid hotel guest charges. As the Bank has never taken this necessary first step, it has been and remains subject to any and all equitable defenses against the debtor accrued by the Hotel, including the defense

of setoff. The Bank still has a secured interest in the proceeds of the debtor's right to unpaid guest charges, but the value of that interest after the Hotel's properly executed setoff is nil.

### 2. Setoff of post-petition debts

The Bank argues that the court erred in allowing the Hotel to set off post-petition debts in its Adequate Protection Order because the post-petition debts were also subject to the Bank's lien and Subordination Agreement. The Bank also argues that the Hotel offset its post-petition debts in part with pre-petition claims, a practice that was not approved by the Adequate Protection Order.

The court rejects the Bank's first argument as contrary to § 552 of the Bankruptcy Code, which restricts a creditor's lien to property acquired by the debtor before the filing of the debtor's bankruptcy petition. *See* 11 U.S.C. § 552. As for the Bank's second argument, the court need not consider it on the merits because the court's disposition of the Bank's first argument leads to the inescapable conclusion that the Bank lacks standing to challenge any setoff involving post-petition claims of the debtor.

### (a) Effect of 11 U.S.C. § 552

Under § 552 of the Bankruptcy Code, "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Consequently, the Bank's lien did not attach to the debtor's post-petition receivables. As noted in section II.A.2.c, *supra*, the Bank cannot assert an interest superior to that of the Hotel based on the parties' Subordination Agreement where the Bank has no interest in the disputed collateral at all.

The Bank argued briefly at oral argument that § 552(a) did not extinguish its post-petition security interest in the guest charges because certain exceptions to § 552(a) provided by § 552*(b)* apply to the guest charges. The Bank has also argued that it possesses a separate interest in post-petition collateral under the terms of the Cash Collateral Order. The court considers each of these arguments in turn.

### (i) Section 552(b)(1) exception

■ Section 552(b) of the Bankruptcy Code provides that if a security interest in property extends to proceeds, products, offspring, or profits of that property, then the security interest is effective against the proceeds, products, offspring, or profits of such property acquired post-petition "to the extent provided by such security agreement and by applicable non[-]bankruptcy law." 11 U.S.C. § 552(b)(1). The Bank argues that the guest charges at issue here are post-petition "proceeds" of the food served by the debtor. This strained interpretation of the term "proceeds" does not accord with the applicable statutory language or with the case law on this point.

The UCC defines the term "proceeds" to encompass "(A) whatever is acquired upon the *sale*, lease, license, exchange, or other disposition of *collateral;* [or] (B) whatever is collected on, or distributed *on account of* [ ] *collateral* ...." VA. CODE. § 8.9A–102(a)(64). Without question, to the extent that a restaurant or hotel patron pays a set price *only* for food or a beverage (*e.g.*, by purchasing a beverage from a vending machine in the hotel lobby), that payment is a form of proceeds within the meaning of the UCC and § 552(b)(1). *See In re Cafeteria Operators, L.P.,* 299 B.R. 400, 409 (Bankr.N.D.Tex.2003) (holding that payment attributable directly to the sale of food and beverage inventory consti-

tuted "proceeds" of such inventory under the Massachusetts version of the UCC).

But as anyone who has ever ordered a twenty-dollar hamburger from their hotel can readily attest, the cost of ordering room service includes far more than the value of the food and beverages served. It derives in large part from the unique service provided by the hotel: the luxury of having one's food prepared and served in one's own room without having to resort to the local Pizza Hut.

What little case law exists on this point suggests that the court's ambivalence towards the Bank's expansive reading of the term "proceeds" is well-founded. In *In re Inman*, 95 B.R. 479 (Bankr.W.D.Ky.1988), a secured creditor argued that the money received from the sale of fast-food constituted "proceeds" of the restaurant's inventory rather than after-acquired property of the debtor. *Id.* at 480–81. In support of its argument, the secured creditor noted that fast-food restaurants simply provide food, and not service, to the customer, whereas upscale restaurants may be classified as service providers. The court held that the money obtained from the sale of the food was after-acquired property and did not constitute proceeds of inventory. *Id.* It found that the restaurants were engaged primarily in the service industry and that cash earned from operations was not a proceed from the sale of inventory. *Id.* Notably, the court reasoned that "the degree of service is not the significant factor for our consideration. . . . the res-

taurant industry, in general, is a service-oriented industry." *Id.*

The room *service* charges here fall within the service industry to an even greater extent than a typical restaurant bill. Patrons of room service pay for a meal prepared and served by another that is delivered to their hotel room. Guests of the Hotel that patronized the restaurant and charged their meal to their room also received a service: a customer in the restaurant industry pays a premium for having a chef prepare a meal in a manner in which the customer might be unable to prepare it.[32]

To the extent that the Bank could have established that the guest charges at issue here were partially or wholly attributable to the sale of food inventory in which the Bank had a lien on the petition date, the Bank could have asserted a lien on those proceeds. But the Bank has not produced any evidence demonstrating that any portion of the guest charges at issue can be identified as proceeds of the inventory on which it had a lien on the petition date. Because the burden of establishing this defense would rest with the Bank at trial, the Bank's failure to produce *any* evidence in the face of a motion for summary judgment is inexcusable. The court will grant the Hotel summary judgment with respect to the Bank's § 552(b)(1) defense.

#### (ii) *Section 552(b)(2) defense*

■■■ The Bank also asserted at oral argument that the guest charges at issue here fall within the second exception to § 552(a), which provides that

---

**32.** Although the court in *In re Inman* chose not to delve into the level of service provided by the fast-food restaurants at issue in that case, if this court were to analyze the level of service provided at the debtor restaurant it would no doubt find a high level of service. At oral argument, the Bank referred to Timothy Dean's as a "first class restaurant." The Lease between the debtor and the Hotel also

set forth an "express condition that Tenant shall maintain a level of quality of [the debtor's] operations in the Premises at a level equal to or better than similar operations in other luxury hotels" (Lease ¶ 5.1). Without a doubt, patrons of a first-class restaurant are paying for the preparation of their meal by a first-class chef.

if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as *rents* of such property or the fees, *charges, accounts,* or *other payments* for the *use* or *occupancy* of *rooms* and *other public facilities* in *hotels, motels* or *other lodging properties,* then such security interest extends to such rents and such fees, charges accounts or other payments acquired by the estate after the commencement of the case to the extent provided in such Security Agreement.

11 U.S.C. § 552(b)(2) (emphasis added).

Section 552(b)(2) of the Bankruptcy Code was enacted as part of the Bankruptcy Reform Act of 1994. 5 *Collier on Bankruptcy* ¶ 552.03[1] (15th ed. rev'd 2002). The section was designed to address situations where a secured party has a pre-petition security interest in a hotel and the profits, proceeds, and rents from that hotel. By its plain text, the exception set forth in § 552(b)(2) is limited to "rooms and other public facilities in hotels, motels[,] or other lodging properties." Nonetheless, the Bank argues that this exception should apply to the guest charges at issue here, which were for food services, not for room occupancy, because the debtor's restaurant was located in the Hotel.

This argument is hard to swallow. Congress amended § 552(b) to clarify that § 552(a) does not extinguish a secured creditor's lien on hotel room fees if those fees were included in a creditor's security agreement with the debtor. 5 *Collier on Bankruptcy* ¶ 552.LH[1][b] (15th ed. rev'd 2002).[33] Nothing in the text or legislative history of the section suggests that it intended § 552(b)(2) to apply to the food service charges of restaurants at all. The Bank's proffered reading of the statute would require the court to conclude that, aside from the reasons actually stated in the legislative history, Congress intended to benefit the secured creditors of restaurants located in hotels—but not restaurants located anywhere else—by treating post-petition food service charges owed such a restaurant as "rents" of property of the debtor in which the secured creditor had a pre-petition security interest, or as charges for room occupancy. The court declines to interpret § 552(b)(2) in such a bizarre fashion.

### (iii) *Cash Collateral Order*

■ Finally, the Bank asserted at oral argument that even if § 552 operated to extinguish its security interest in the guest charges, the Bank retained its security interest in the debtor's post-petition receivables because the Cash Collateral Order granted the Bank "a replacement lien on new/replacement receivables on a dollar for dollar basis for the use of its collateral with the bank to retain its secured position in that same secured status as it held on

---

**33.** Prior to the Bankruptcy Reform Act, § 552(b)(1) (then § 552(b)) was the only exception available to § 552(a). That section exempted the "proceeds, product, offspring, rents, or profits" of collateral secured prepetition "to the extent provided by [the parties'] Security Agreement and by applicable non-bankruptcy law." 11 U.S.C. § 552(b) (amended 1994) (emphasis added). Many courts defined amounts paid by guests for hotel rooms as personalty rather than "proceeds" or "rents" under non-bankruptcy law. *See, e.g., In re Oceanview/Virginia Beach Real Estate Assocs.,* 116 B.R. 57, 58–59 (Bankr. E.D.Va.1990). Concerned that lenders' security interests in such revenues were invalidated by § 552(a), thereby depriving hotels of some of the most liquid and valuable assets that could be used as collateral, Congress changed the statute. *See* 140 Cong. Rec. H. 10768 (daily ed. October 4, 1994).

the date of the petition" (Cash Collateral Order ¶ 2). However, the Cash Collateral Order also contemplated that the debtor would remain current on its Lease and note payments to the Hotel and that such payments would be made by setting off amounts owed on the Lease and notes against guest charge receivables collected by the Hotel. The provision granting the bank a replacement lien on new receivables should therefore be construed as granting the Bank a lien on the debtor's *net* receivables (*i.e.*, any receivables remaining after the debtor's Lease and note obligations were paid to the Hotel).[34]

**(b)** *Standing to challenge the Hotel's setoff of post-petition debts with pre-petition claims*

 Because the Bank has no interest in unremitted guest charges arising post-petition under § 552, it has no standing to challenge the Hotel's setoff of amounts owed on those guest charges with pre-petition claims. " '[T]he irreducible constitutional minimum of standing contains three elements': (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Idaho Public Util. Comm'n v. ICC,* 35 F.3d 585, 590 (D.C.Cir.1994) (quoting *Lujan v. De-*

*fenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Assuming *arguendo* that certain portions of the amounts owed by the debtor and set off by the Hotel pursuant to the Adequate Protection Order arose pre-petition (an issue that the court declines to decide here), the Bank, as a secured creditor, suffered no "injury in fact" as a secured creditor as a consequence of this act because the Bank has no rights with respect to the amounts set off by the Hotel in the first place.

To the extent that the Hotel improperly set off post-petition claims of the debtor against pre-petition claims of the Hotel, that would only mean that the Hotel would owe the estate the amount by which it improperly reduced the post-petition amounts that it owed. However, the chapter 11 trustee chose to resolve all of the debtor's pre- and post-petition claims against the Hotel through the Settlement Agreement, and White, the current trustee, is the only person with standing to pursue such a claim in any event. Once again, summary judgment against the Bank is appropriate.

**C.** *Property Provided to the Debtor by the Hotel*

 Section 3.2 of the Lease specifies that

---

**34.** The Bank alleges that it did not have proper notice of the Adequate Protection Order, which authorized the Hotel to exercise post-petition setoffs. The court actually entered two orders—the Adequate Protection Order and the Cash Collateral Order—contemplating setoffs by the Hotel, and the authorization in the latter order moots any lack of proper notice with respect to the first order. These orders were both entered on January 7, 2002. It appears from the record that the Bank received notice of the Cash Collateral Order. The Bank, through Susan M. Banks, consented to the court's entry of an interim order authorizing the use of cash collateral on December 4, 2001. In that order, the court

informed the parties that it would hold a final hearing on the debtor's cash collateral motion on December 5, 2001. The Bank was sent a copy of that order.

The Bank did not appear at the December 5, 2001 hearing. However, the debtor represented to the court that it would submit a revised order authorizing use of cash collateral with the consent of both the Bank and the Hotel, and the final order authorizing the use of cash collateral signed by the court indicated that both the Bank and the Hotel had consented to its terms. Moreover, although the Bank received copies of both the interim and final orders, it never filed an objection with the court.

upon the termination of this Lease all furniture, fixtures, equipment and inventory items provided by [the Hotel], including, without limitation, china, silverware, glass, linen and kitchen equipment will be returned in the same quantities and condition received, failing which [the debtor] will be liable for the cost of their replacement as determined by [the Hotel].

Pursuant to the terms of the Lease, the debtor agreed to return certain property purchased by the Hotel for the debtor's use in the operation of its business to the Hotel upon the termination of the Lease. The Bank conceded, both in its cross-motion for summary judgment and at oral argument, that to the extent the Hotel provided property to the debtor, the Bank has no interest in that property.

There is, however, a dispute (albeit, upon closer examination, not a genuine one) as to whether the Hotel loaned the debtor $12,500.00 for the purchase of silverware or instead purchased the silverware for the debtor's use. The dispute arose because the Hotel issued a check to the debtor for $12,500.00, which was then used to purchase silverware. The Bank alleges that this transaction was a loan from the Hotel to the debtor, while the Hotel alleges that it was simply purchasing silverware for the debtor's use and thus owns the silverware.

The record before the court points overwhelmingly in favor of the Hotel with respect to the nature of the $12,500.00 payment made by the Hotel. First, section 3.2 of the Lease contemplates that the Hotel provide the debtor with silverware and that the debtor surrender this silverware to the Hotel upon termination of the Lease. Second, the affidavit of Firdaus Kadir, the Hotel's Financial Controller, states that the Hotel purchased silverware for the debtor. Attached to Mr. Kadir's affidavit is a copy of an accounts payable check request and a receipt signed by Timothy Dean indicating that he received the check "for the purpose of purchasing silverware." The receipt also indicates that Timothy Dean would forward the original receipt for the purchase to the Hotel accounting office.

The accounts payable check request indicates that the purpose of the check was "to purchase silverware for the new restaurant in lieu of 'old' silverware[,] which [the Hotel] decided to keep for Banquet [facilities adjacent to Timothy Dean's, and managed by the Hotel] to keep them uniform in pattern" (Hotel Ex. 2–B).[35] The language on the receipt and the accounts payable check request, as well as Timothy Dean's promise to send the original receipt to the Hotel, indicate that the Hotel intended to purchase the silverware for the debtor.

The Bank argues that because the Hotel's check is made out to Timothy Dean's, Inc., the payment was a loan to the debtor. But while the check certainly suggests that the Hotel paid Timothy Dean's, Inc. $12,500.00, it is silent with respect to the reason for that payment. In the absence of any evidence favoring the Bank's view of the purpose for the Hotel's payment, and in light of the Hotel's evidence on that very point, the Bank's argument runs aground once again on the shoals of Rule 56.

---

**35.** At oral argument, the Hotel further clarified that the silverware it originally provided to Timothy Dean's contained unmatching pieces. Therefore, the Hotel retained some pieces for use in the banquet facilities and purchased the new silverware for the debtor. However, summary judgment in the Hotel's favor would be appropriate even without reliance on this clarification.

D. *Settlement Agreement Proceeds*

 Both the Bank and White seek summary judgment as to the Bank's interest in $118,000.00 of the $135,000.00 paid to the chapter 11 trustee in settlement of the debtor's motion to assume the Lease and the Hotel's motion for relief from the automatic stay to terminate the Lease. Because an Article 9 security agreement cannot apply to the creation or transfer of an interest in or lien on real property under § 9–109 of the UCC, the Bank must demonstrate that the Settlement Agreement and the proceeds arising from that agreement involve additional interests outside the Lease in which the Bank had a security interest. The Bank's failure to identify any such interest dictates that the court rule against it with respect to the proceeds of the Settlement Agreement.

1. *The Bank's interest in the Lease*

Section 9–109 of the UCC provides the starting point for the court's analysis. That section provides that Article 9 applies to "[a] transaction, regardless of its form, that creates a security interest in *personal* property by contract." VA. CODE § 8.9A–109(a)(1) (emphasis added). Section 9–109 further clarifies that Article 9 does *not* apply to "the creation or transfer of an interest in or lien on real property including a lease or rents thereunder . . . ." *Id.* at § 8.9A–109(d)(11); *see also* 9C *Hawkland UCC Series* § 9–109:15.[36] Based on these provisions, it is clear that the Bank did not have a security interest in the debtor's rights under the Lease.

In addition to settling certain claims against the Hotel, *see* part II.D.2, *infra,* the Settlement Agreement required the debtor to forfeit its right to assume the Lease and remain in the restaurant; the debtor therefore received damages from the Hotel for early termination of the Lease. The debtor's right to continue possession was not personal property, but instead was a right under the Lease. For the debtor to give the Bank a right to these proceeds, it would have had to "transfer an interest in a lease", *see* VA. CODE § 9–109(d)(11), and Article 9 would not have governed that transaction.

Cases holding that Article 9 applies to transactions involving real property are distinguishable because they clearly involve security interests in personal property. For example, in *United States v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo. 1975), the court found that a landlord's security interest in accounts receivables to secure payments due under a lease was not excluded from the scope of Article 9. *Id.* at 1192. Similarly, in *Commercial Credit Co. v. Campbell,* 74 F.2d 468 (D.C.Cir.1934), the court held that an assignment of rents due under a lease was an assignment of personal property because "the owner may transfer the rents and still retain his entire interest in the land." *Id.* at 469.

In both cases, the secured creditor's interest was in a type of personal property (accounts receivable in *PS Hotel,* rents in *Commercial Credit).*[37] In this case, a se-

---

**36.** Section 9–604 of the revised UCC sets forth the procedure for the enforcement of a secured creditor's rights if the applicable security agreement covers real property. *See* VA. CODE § 8.9A–604. Where an agreement covers both real and personal property, the creditor may elect to enforce her rights with respect to secured personal property using the other provisions of the UCC and enforce her rights with respect to secured real proper-

ty through recourse to state law, or she may elect to enforce both types of rights using state law. The one thing that she cannot do is enforce her rights with respect to realty using the UCC. *Id.* at § 8.9A–604(a); *see also* 9C *Hawkland UCC Series* § 9–604:1.

**37.** *Commercial Credit* was decided prior to the enactment of § 9–109 of the UCC, making it even less helpful to the court's analysis.

cured party that is not a party to the Lease is attempting to claim a security interest in the debtor's rights to retain possession of the premises and to assume the Lease itself. These rights are inextricably tied to the real property and cannot be classified as personal property.

Because Article 9 does not apply to the creation of a security interest in real property, the Bank could only perfect its interest in the Lease by using District of Columbia law pertaining to real property. Therefore, if the debtor intended to convey an interest in its Lease to the Bank, the parties should have executed a deed of trust, *see* D.C. CODE §§ 42–801; 42–306 (2001),[38] and, to perfect the interest, should have recorded the deed of trust in the

office of the Recorder of Deeds. *See* D.C. CODE § 42–401 (2001). The Bank's failure to produce any evidence suggesting that either of these things occurred ends any speculation into the possibility that it held an interest in the Lease.[39]

### 2. *"Choses in action" subject to the Settlement Agreement*

The Bank attempts to evade the implications of § 9–109 by arguing that the Settlement Agreement involved "choses in action" concerning future causes of action held by the estate, which the Bank would classify as "general intangibles" under the UCC subject to the Bank's Security Agreement with the debtor. *See* VA. CODE §§ 8.9A–102(a)(42); 8.9A–109(a)(1).[40] This

---

**38.** Although the parties did not enter into a deed of trust *per se*, they entered into the Security Agreement, which the Bank argues is broad enough to grant it an interest in the Lease. Nonetheless, the court does not believe that the parties intended for the agreement to convey any interest in the Lease. Section 3 of the Security Agreement states that the debtor is conveying an interest including "but not limited to ... a 1st Priority UCC Lien." As the court has already noted, Article 9 of the UCC does not apply to the creation of liens on interests in real property. Moreover, although the Security Agreement indicates that the interest it conveys is "not limited to" a first priority UCC lien, and lists "real estate contracts" as collateral, the remaining provisions of the Security Agreement only appear to convey an interest in personal property of the debtor, with such transactions to be governed by the UCC. The debtor's rights under a contract to purchase real property would be a contract right, a species of personal property, to which the UCC would apply, in contrast to a lease, which the UCC expressly does not cover. The parties' failure to include a description of the Lease and the real property being leased on the financing statement filed with the Recorder of Deeds further evinces their lack of intent to convey an interest in the Lease to the Bank. The bottom line is that Article 9 does not apply to real property transactions and there is no evidence that the parties intended to create a deed of trust through the Security Agreement.

**39.** Even if the parties intended to create a valid deed of trust, such a deed was never perfected because it was not validly recorded in the Office of the Recorder of Deeds with a reference to the real property at issue, and White would therefore have a senior interest. The Bankruptcy Code provides that a trustee may avoid any interest created by the debtor that would be voidable by "a *bona fide* purchaser of real property ... against whom applicable law permits such transfer to be perfected, that obtains the status of a *bona fide* purchaser at the time of the commencement of the case ...." 11 U.S.C. § 544(a)(3). Given that a *bona fide* purchaser of an interest in real property could avoid an unrecorded transfer of which he had no knowledge, the trustee, who stands in the shoes of a *bona fide* purchaser, would have the senior interest in the lease. *See* D.C. CODE § 42–401 (deed is not effective against *bona fide* purchaser until recorded); D.C. CODE § 42–801 (deed of trust shall take effect against *bona fide* purchaser in same manner as absolute deed).

**40.** The Bank also argued that the Settlement Agreement involved the inventory addressed in part II.C, *supra*, the guest charges addressed in part II.B, *supra*, and the security deposit addressed in part II.A, *supra*. As the reader hardy enough to have made it this far in the court's opinion will doubtless recognize, the court has already concluded that the Bank has no valid security interest in any of these items.

argument has some merit. Paragraph 6 of the Settlement Agreement states that upon payment to the chapter 11 trustee, the debtor would release the Hotel from all claims related to the Lease "and the prior relationship between the parties." As noted previously, choses in action are general intangibles under § 9–102 of the UCC, *see* note 22, *supra,* and the Bank had an attached and perfected security interest in the debtor's general intangibles. Therefore, to the extent that the proceeds of the Settlement Agreement are attributable to the debtor's release of claims against the Hotel unrelated to the Lease, the Bank has an interest in those proceeds.

The problem for the Bank is that while its theory is sound, its evidentiary support for that theory is nowhere to be found. For the Bank to prevail on its motion for summary judgment with respect to this issue, it would need to produce undisputed evidence that the debtor held other "choses in action" besides those related to the Lease. For the bank to survive the motion for summary judgment filed by White, it would need to produce *some* evidence of the same. But the Bank cannot identify, let alone verify, other causes of action held by the debtor arising from the debtor's prior relationship with the Hotel other than causes of action arising from the Lease. Once again, the Bank's failure to satisfy the evidentiary requirements of Rule 56 proves to be its downfall.

### 3. *"Proceeds" of the Lease*

■ The Bank's second argument regarding the proceeds of the Settlement Agreement is even less successful than its first. The Bank argues that its financing statement clearly covers the proceeds of a settlement as a "general intangible" no matter the source of the "proceeds." *See In re Phoenix Marine Corp.,* 20 B.R. 424, 425–26 (Bankr.E.D.Va.1982) (holding that an interest in settlement proceeds was perfected as general intangible even though the proceeds arose from a tort claim, a type of collateral outside the scope of Article 9). Even if the holding in *Phoenix Marine* applies to the proceeds of a settlement of lease obligations, that would not help the Bank. As the court discussed at length above, *see* part II.B.2, *supra,* § 552(a) prevents the Bank from arguing that it has a security interest in *any* post-petition proceeds where it does not have an enforceable security interest in the pre-petition property (in this case, the Lease) from which the proceeds derive.

The Bank did not have an effective lien on the Lease. Therefore, the settlement proceeds attributable to the Lease could not be subject to the Bank's lien because they are post-petition proceeds of pre-petition property (the Lease) in which the Bank did not have a lien. The court will grant summary judgment in favor of White with respect to the proceeds of the Settlement Agreement.

### E. *Wine Inventory*

■ The Bank alleges that the chapter 11 trustee sold a portion of the debtor's wine inventory to a private purchaser. The Bank argues that it had a lien on the debtor's inventory and its proceeds and therefore is entitled to the proceeds from the sale of the inventory. The parties agree that the approximate value of the proceeds is $4,500.00.[41] Because there are numerous factual issues that the court is unable to resolve on the current record,

---

41. White did not respond to this issue in his opposition to the Bank's motion, but the parties addressed it at the hearing on the various motions for summary judgment filed by the parties.

the court will deny the Bank's motion as to the wine inventory.

It is clear from the Security Agreement entered into by the Bank and the debtor that the Bank had a lien on the debtor's pre-petition inventory and its proceeds. The Security Agreement gives the Bank a security interest in the debtor's inventory "whether now owned or hereafter acquired." A restaurant's wine qualifies as "inventory" under Virginia law. *See* VA. CODE § 8.9A–102(48)(B) (defining inventory, in part, as goods held for sale).[42] The financing statement filed by the Bank also expressly indicates that the Bank has a security interest in "wine inventory if purchased by [the debtor] subsequent to May 15, 2000" (Hotel Ex. 9 at Sch. A). The Bank thus properly perfected its security interest as to inventory purchased after May 15, 2000. *See* VA. CODE § 8.9A–310(a).

The court cannot, however, grant summary judgment to the Bank because it has not presented any evidence as to whether the wine was inventory acquired pre- or post-petition. To the extent that the wine was acquired by the debtor between May 15, 2000, and October 16, 2001, the Bank's security interest and its Subordination Agreement with the Hotel should operate to give it a superior interest in the wine and any proceeds from its sale. However, to the extent that the wine was acquired post-petition, the Bank's lien is extinguished by 11 U.S.C. § 552(a) for the same reasons discussed in part II.B.2.a.i, *supra*, regarding post-petition guest charges.

Finally, the Bank cannot rely on the Cash Collateral Order as the basis for asserting a lien on inventory acquired post-petition because the order gave the Bank a replacement lien only on the debtor's receivables. While the Bank may regret its decision to consent to that order, it cannot re-write the order now. *Cf. In re Cross Baking Co.*, 818 F.2d 1027, 1032 (1st Cir.1987) (holding that where a secured creditor consented to the debtor's use of cash collateral only on the condition that a Cash Collateral Order giving it a replacement lien be entered, and the creditor failed to ensure that such an order was entered, the creditor was precluded from asserting that its consent to the use of cash collateral was ineffective).

For all of the above reasons, the court will deny the Bank's motion for summary judgment as to this issue. The court will not grant summary judgment in favor of White on this point only because White failed to move for summary judgment with respect to the wine inventory. Should White file such a motion, the burden will rest with the Bank to produce some evidence suggesting that at least some of the wine sold by White was purchased between May 15, 2000, and October 16, 2001.

### III

The court will grant the Hotel's motion for partial summary judgment with respect to the issue of the debtor's security deposit and the pre-petition and post-petition guest charges, and will grant White's motion for partial summary with respect to the proceeds of the Settlement Agreement

---

**42.** White suggested at oral argument that a creditor could not obtain a security interest in alcohol. The court could find no Virginia case or statute prohibiting or allowing such a transaction. The court did, however, find case law from other jurisdictions in which courts examined security interests in alcohol. *See, e.g., Levine v. Lacher & Lovell–Taylor*, 256 A.D.2d 147, 681 N.Y.S.2d 503 (N.Y.App.Div. 1998). In addressing the Security Agreements in those cases, the courts did not indicate that it was improper to grant a security interest in alcohol. Therefore, it appears that one can grant a security interest in alcohol just as one would grant a security interest in any other type of personal property.

as well. Finally, the court will deny the Bank's motion for summary judgment in its entirety.

The only issue not resolved by this decision is the value of White's lien in the proceeds of the wine inventory sold by either White or the chapter 11 trustee. Rather than proceed immediately to trial, the court will grant White an opportunity to file a motion for partial summary judgment with respect to this issue, as such a motion may obviate the need for a trial in this proceeding.

An order follows.